Tennessee Central Railroad Company v. Campbell.

| 109 | 655 |
| 116 | 448 |
| 116 | 515 |
| f116 | 533 |

TENNESSEE CENTRAL RAILROAD COMPANY *v.* CAMPBELL,

AND

SAME *v.* MURPHY LAND COMPANY.

(*Nashville.* December Term, 1902.)

1. **CHARTER.** Defective acknowledgement to amendment. Curative act.

By the express provisions of the statute (acts of 1901, ch. 118) an amendment to a charter of a railroad company, originally defective because of acknowledgment before a notary public, is validated. *Post, pp.* 663-664.)

Act cited: Acts of 1901, ch. 118.

2. **SAME. RAILROAD.** Location of line, not being definitely fixed in charter, discretion vested in company.

Where a railroad company was authorized by its charter to build and operate a line of railroad between two designated points or termini, and no exact and definite line is fixed in the charter, discretion as to the location of the line is vested in the company, provided there is not a substantial departure from the course and direction indicated by the charter. (*Post, pp.* 664-667.)

Case cited: Railroad Co. *v.* Stoddard, 6 Minn., 150.

3. **SAME.** Same. Same. Case in judgment.

Condemnation proceedings by the railroad company were opposed on the ground that it was attempting to build a belt line around the city of Nashville, for which it was without

Tennessee Central Railroad Company v. Campbell.

charter authority. By its charter the railroad company was authorized to build a line of railroad from the State line beyond Clarksville to the eastern terminus in Roane county *by way of Nashville.* The company insisted that it was not constructing, or proposing to construct, a belt line, but only a main line from N. to C. *It appeared* that while the route selected was not the most direct one between the two places and did encircle the city of Nashville to the extent of some ten miles, it was virtually forced upon the company by economic considerations, growing out of the physical features and topography of the country, instead of other purposes and designs, such as a belt line to reach industrial enterprises and business centers.

HELD: *The route proposed is not a belt line.* (*Post, pp.* 661-667.)

4. **RAILROAD. Line of, need not be located by directors of railroad company.**

Whatever may be the policy of other States the policy of this State, in respect to the location of the line of a railroad between the termini designated in its charter, is liberal and broad, and there being no statutory requirement that the line of a railroad be located by the directors, the fact that the proposed route was not located by the company, or approved by the formal action of its directors, but only by the president upon the suggestion and under the advice of its general manager and engineers, can not be set up in condemnation proceedings as a defense impeaching the validity of the location. (*Post, pp.* 667-671.)

Code cited and construed: Sec. 1542e, 1560, 2024 *et seq.*, 2076, 2413, 2415, 1844-1867 (S).

5. **CHARTER. Construction of—Question for Court.**

Whether a railroad company has under its charter the right to maintain condemnation proceedings and acquire thereunder a certain route for the location of its line of railroad, is a preliminary question involving the right to condemn, to be determined by the court whose duty it is to construe the language of the charter. (*Post, pp.* 671-673.)

Cases cited: McWhirter *v.* Cockrell, 2 Head., 10; Evans *v.*

Tennessee Central Railroad Company v. Campbell.

Shields, 3 Head, 70; Scudder *v.* Falls Co., 1 N. J. Eq., 694; Savannah *v.* Hancock, 91 Mo., 54; Railroad Co. *v.* Chicago, 166 U. S.. 234.

FROM DAVIDSON.

Petitions for *certiorari* and *supersedeas* to the Circuit Court of Davidson County.

PITTS & WITHERSPOON, for the railroad company.

T. M. STEGER, T. H. MALONE, JR., J. M. AMBROSE, J. H. ACKLIN, JOHN J. VERTREES, WM. O. VERTREES, J. C. BRADFORD, JAMES A. RYAN and JAS. S. PILCHER, for Campbell and wife.

J. C. BRADFORD, J. M. ANDERSON and JAS. A. RYAN, for Murphy Land Company.

MR. JUSTICE WILKES delivered the opinion of the Court.

This is an application for writs of *certiorari* and *supersedeas* to review the action of the law court of Davidson county in proceedings instituted to condemn rights of way across lands of the petitioners. The cases involve the same questions of law, and, while the parties and lands affected are not the same, yet the rights of way are sought over each by the same railroad company and the same line of road, and they will therefore be considered together.

The cause has been before the court upon a former occasion for the same purpose. *Railroad* v. *Campbell,* ante, page 640. At the time of the filing of the first petition the court below had proceeded regularly to the appointment of a jury of inquest or commissioners to lay off the right of way required, and to assess the damages of the defendants, but no report of its action had been filed. Upon the application for the jury, the defendants resisted the taking of their property by issues made in their answers to the petitions filed by the railroad company, insisting upon grounds more fully set out hereafter.

Upon the appointment of the jury, they tendered their bill of exceptions and prayed an appeal to this court, which was denied. They filed their first petition for writs of *certiorari* to bring the proceedings before this court for review, and, pending the decision of this court, for *supersedeas* to suspend further proceedings in the court below, to prevent any entry upon the land and stop prosecution of the work. Upon mature consideration of the objection made, that *certiorari* would not lie to review such proceedings, this court held that it would lie in a proper case, and was a substantive mode for the correction of errors, to which a party is entitled as a matter of right, as much as to any other mode for the correction of errors of inferior tribunals; citing in support of the holding Shannon's Code, secs. 4834, 4853, 4854, 6329, 6336; *Kearney* v. *Jackson,* 1 Yerg., 294; *Warner* v.

Tennessee Central Railroad Company v. Campbell.

*State,* 13 Lea, 52; *Johnson* v. *Harris,* 16 Lea, 136; *State* v. *Taxing District,* 16 Lea, 245; *Brizendine* v. *State,* 103 Tenn., 677 (54 S. W., 982).

It was also held that in such cases, in the discretion of the court, a proper case being presented, *supersedeas* might issue to stay further proceedings in the court below pending the disposition of the case in the appellate court. Shannon's Code, sec. 6336.

But the court was further of opinion that at the then stage of the proceedings, a proper case was not presented for the issuance of the writs; that it was only after the report of the jury, assessing the damages, had been filed, exceptions thereto, if any, disposed of, and demand made by either party for a trial by a traverse jury in the court, or, in the absence of such contesting proceedings, the report had been confirmed, the right of way adjudged to the road, and the damages awarded the landowner, that the judgment became final, in such sense that it might be reviewed, in the case first put, by *certiorari,* and that *supersedeas* in proper case might issue.

The court was of opinion that proceedings to condemn land for rights of way were, under our statute, dual in their nature; that is, a preliminary question, in proper cases, may arise as to the right of the road to acquire and condemn rights of way, either altogether, or across the particular lands of the defendants; and when this preliminary question is raised, and settled by the appointment of a jury of inquest, and

that jury has acted as the statute prescribes, and has made its report, which has been excepted to, and a traverse jury demanded, for a trial in court, then the defendant may have the question of the right to condemn reviewed upon *certiorari* to this court. The theory is that the cause, as to this feature of the case, has reached a final decree, inasmuch as the petitioners may then, upon giving bond, as the statute provides, to secure the compensation that may be finally adjudged, have the defendants ejected from the right of way, and take possession of the same, and proceed to construct its road. Not only may *certiorari* issue in such case, but *supersedeas,* also, if a proper case is made out, in the judgment of the court, to warrant a stay of proceedings, while the right to take is being reviewed.

The gist of the decision is that every citizen, whose land is sought to be taken for rights of way, has the right to test the preliminary question whether the railroad seeking such rights of way is entitled thereto upon any terms.

The question of the amount of compensation to be paid is a separate one, but dependent, from the nature of the case, upon the right to take at all.

After the adjudication was thus made upon the first application for writs of *certiorari* and *supersedeas,* refusing the same for the reasons and upon the grounds stated, the petitioners filed other petitions, and now represent that the proceedings have

reached such a stage, as heretofore indicated in the opinion of the court, as authorizes the issuance of the writs. These second petitions were presented to the chief justice of this court at chambers, and he ordered the issuance of the writ of *certiorari* as prayed for, but denied the application for *supersedeas*. The matter now comes before this court upon the merits of the preliminary inquiry, and the question is, has the plaintiff shown a legal right to condemn the lands of defendants as it seeks to do? We do not understand that any serious controversy is now made as to the right to the *certiorari*, nor the correctness of the action of the chief justice in granting the same. No motion is made to dismiss, but the case is presented to us and argued before us as to the right and propriety of permitting the railroad to condemn the right of way. The railroad company has demanded and been granted a trial by jury in the court below upon the feature of the amount of compensation, and that matter is not now before this court.

It appears that the report of the jury of view and inquest has been made and filed, and to it the railroad company has excepted, and from it prayed and been granted an appeal to a traverse jury in court upon the question of the amount of compensation. The company has tendered a bond, which has been accepted, and is entitled, under the law, to possession of the lands and rights of way, and it has entered upon them to construct the road, and pending the proceedings

under these second petitions much work has been done upon such construction.

The points now made against the right of the railroad to condemn the rights of way are, in substance, as follows: (1) That complainant railroad has no charter authority to construct the line of road at the place and along the route now being occupied by it; (2) that the railroad company is attempting to construct a belt line around the city of Nashville, instead of a main or direct line from Nashville to Clarksville, or to build such belt line in addition to and in connection with the line from Nashville to Clarksville; (3) that the line or route has never been located by the railroad company through its proper officials, as is authorized by law, but that the line was and is located alone by the president and engineer. The contention may be summarized that the railroad has no charter authorizing the route selected; that it has no right, under its charter, to build a belt line; and that the line or route can only be located by the directions of the company, and not by its president and engineer.

Considering the first question raised, it appears that the complainant road had its birth under a charter naming it as the Nashville & Clarksville Railroad, and its purpose, as stated in this original charter, is to construct and operate a railroad from the city of Nashville to Clarksville, in Montgomery county.

This original charter was amended in June, 1901, so as to change its northern terminus from the city of

Clarksville to a point in Montgomery county, at the State line, between the States of Tennessee and Kentucky, in a northwesterly direction from the city of Clarksville, and so as to change its capital stock from one million dollars to seven million dollars; the object being to purchase and consolidate the Tennessee Central Railway Company and Nashville & Knoxville Railroad Company, in addition to building its own line from Nashville to Clarksville, and on to the Kentucky State line, so as to form a continuous line, by way of Clarksville, Nashville, Lebanon and Cookeville, to the Southern and Cincinnati roads; and these various lines were accordingly purchased and consolidated under the name of the Tennessee Central Railroad Company, and these latter amendments were made in April, 1902.

The Tennessee Central Railroad Company, above referred to, was chartered in June, 1897, to construct a railroad from the west bank of Clinch river, near Kingston, Roane county, to the city of Nashville, and this charter was subsequently amended by changing the western terminus from the city of Nashville to Clarksville.

It is said this amendment was acknowledged before a notary public, and it is insisted that this rendered it inoperative and void; while it is said in reply that, if originally defective because of the acknowledgment, it was validated by chapter 118, p. 179, of the acts of 1901, amending chapter 17, p. 43, of the acts of

the extra session of 1890. We think the contention of invalidity not well made.

It thus appears that the Tennessee Central Railroad Company, under its own charter, has authority to construct and operate a line of road from Nashville to the State line, northwest of Clarksville, by way of Clarksville, and by virtue of the charter of the Tennessee Central Railway, which it has purchased, and now owns, it has authority to construct and operate a railroad from Clinch river to Clarksville by way of the city of Nashville. Neither of these charters locates the exact line, nor any point in either city that must be touched, either in approaching, entering, or leaving the city, but the obvious purpose is to construct a continuous line from the State line, beyond Clarksville, to the eastern terminus in Roane county, by way of the city of Nashville.

We are of opinion that, under the provisions of these charters and consolidation agreements, the complainant company had the right to construct a line of railroad from any point accessible in the city of Nashville, or upon the outskirts of the city, to the city of Clarksville, at such place as it might find accessible and feasible, whether within that city or upon its outskirts; and, the location of the line not being exactly and definitely fixed by charter, discretion vested in the company, as will be more fully discussed hereafter.

The railroad, in response to the second objection

made, says that it is not constructing or proposing to construct a belt line, but only a main or direct line from Nashville to Clarksville.

It appears that the line, so far as it is now in controversy, connects with the tracks of what is styled the Terminal Company at Stanley street in South Nashville, and extends to the bridge across Cumberland river in West Nashville; while petitioners claim that the main or direct line should be over the tracks of the Terminal Company to the foot of Broad street, and thence down the river through the city of Nashville.

The president of the company states that the route selected was chosen after a thorough examination and great expenditure of money, some ten to fifteen thousand dollars, and the result was the selection of the line in controversy as the main line, and that it was virtually forced upon the company against its preference, by the physical features and topography of the country, and economic considerations growing out of these conditions forced the adoption of the line as the best and most feasible one.

The vice president says that the line in question has been finally surveyed and located as the main line, and has been adopted as such by the officers and board of directors of the company, and the company has no other line in contemplation at this time. It appears that the sum of $120,129.28 has been paid for rights of way along this line, and some $200,000 to $300,000

expended in construction, exclusive of the cost of rights of way. The proof tends to show that this line is not through a thickly settled section, built up with residences and business houses, but is through an agricultural section, largely.

It appears that other surveys were made and lines projected, which would have resulted in two routes— one a main line, and another a belt, to reach various industries—but these projects were abandoned because of their cost, and the present line was approved and adopted by the president, superior officers, and others interested in the road in a pecuniary way, as well as by the construction company that built the road.

The general manager, Miller, gives the location of the line from its start at Stanley street to its crossing of the river. The route appears somewhat circuitous, and does not enter the business part of the city, except over the tracks of the Terminal Company; but we have not been cited to any evidence, beyond general statements, showing that the contemplated route is a belt line, instead of the main line. The weight of the evidence is that, while the route selected is not the most direct from the terminus in Nashville towards Clarksville, and does skirt the city by a route some ten miles long, it arises out of economic reasons, instead of other purposes and designs, such as a belt to reach industrial enterprises and business centers.

Under the law in regard to the construction of railroads, when the route is not definitely located by the charter, a legislative discretion is allowed in making such location, provided there is not a substantial deviation from the course and direction indicated by the charter. Elliott on Railroads, vol. 3, p. 1264, note 2; *So. Minn. R. Co.* v. *Stoddard,* 6 Minn., 150 (Gil., 92).

We do not think the contention is sustained that the proposed line is a belt road.

Passing from the question whether the contemplated line is a belt road, it is said that it has never been located by the company or its directors, but only by the president, upon the suggestion or advice of the general manager and engineers. The contention, as before stated, is that, until and unless the line is located by the board of directors of the company, there is no right in the company to condemn the lands along such line.

There does not appear to be any statute of this State so providing, nor is there any decision of the court so holding.

The facts in regard to the manner of the location of the line are stated by the officers of the company to be substantially as follows: The vice president states that the line was finally adopted by the officers and board of director of the company. He says, however, that there was no formal meeting—the proceedings were not reduced to writing, nor spread upon

the minutes. He further states that the line was adopted by both the officers of the railroad and construction company.

Mr. Miller, the general manager, states that the line was agreed on at a meeting held for the purpose of locating the line; that there were present the president, vice president, two directors, the president of the construction company, the general counsel, and general manager, and perhaps others, and, as a result, he was directed to build the line in controversy. The general manager made reports recommending the line, in writing, and they were adopted and filed, and constitute a part of the official records of the company.

As to the legal question involved, we have no direct authority in the statutes of the State.

Under proceedings authorized by our statutes for subscriptions by counties and municipalities to railroads, it is provided there shall be a survey of the entire line, and a substantial location; but it appears, nevertheless, that it is only necessary for the chief engineer to make the survey, location, and estimates, and certify the same (Shannon's Code, secs. 1542e, 1560), and such proceedings are sufficient.

There is no provision in the general incorporation act of 1875 (Shannon's Code, sec. 2024, et seq.) that requires the location to be made by the board of directors. It is not one of the duties of the directors, as enumerated in the act. Shannon's Code, secs. 2024, et seq., 2076, 2413, 2415, 1844-1867.

In proceedings to condemn land for rights of way, the provision is simply that a petition be filed, setting forth the land wanted, the extent wanted, the name of the owner, and the object for which desired, and a prayer that a suitable portion be decreed by metes and bounds. The jury are required to examine the ground, and set apart by metes and bounds a sufficient quantity of land for the purposes wanted, and assess the damages to the owner.

Counsel for petitioners cite quite a number of cases from other States—notably, New York, Pennsylvania, Massachusetts, Rhode Island, Indiana, North Carolina, since 1872—in support of their contention; but it appears that in these States the statutes require the final survey and location to be made, and maps approved by the board of directors, and filed in some public office, before the road can finally determine its line and acquire the right to condemn lands. Rap. & Mack's Dig., vol. 6, 352 to 358.

The rule is laid down in 3 Elliott on Railways, sec. 920, as follows: "When the duty of locating the road is imposed by statute upon the president and directors of the company, an exercise of discretion on their part is called for, which can not be delegated; and a location made by an executive committee provided for in the by-laws of the company is inoperative, and can not be ratified by the company, so as to make it valid as against the rights of another company, which have attached to the property in question

prior to such ratification." Many of the cases cited by petitioners involve controversies between rival lines seeking priority over the same route located by each, and in States where the statutes expressly prescribe that the location shall be made by the board of directors.

But it is insisted that in the absence of any statutory provision, and by the rules and principles of common law, in the absence of any such provision, it is the duty of the directors to locate the line of road, as it is one of the most important of all things required to be done in regard to their building, and that, the board of directors being the governing and legislative body of a corporation, its president or other officers can not enter into contracts in its behalf, except as to matters of simple administration, which must, from necessity, oftentimes be managed by him alone.

These general principles may be conceded, and it may further be conceded that it would be best and more regular for the line to be approved, and in that sense located, by the board of directors, by formal entries upon its minutes; but still the question remains, is such action indispensable to the location? Necessarily the location must be controlled, to a large extent, by the topography of the country, and the natural advantages and obstacles to be met on the different routes; and the determination of these questions rests largely in the engineer, and upon his judgment and discretion the location must largely depend.

It is a question upon which he is much more competent to judge than a director, and upon his report the directors must largely base their action.

Whatever may be the policy of other States, and whatever may be said as to the necessity for corporate acts of an important character to be done by a board of directors, and in a formal manner, we find that the policy of our own State is most liberal and broad, and leaves the question of location largely to the discretion of the company. The legislature does not designate either the route or the terminus. The charter need not designate the route, but only the terminus, and it need not prescribe the manner of surveying and locating the route.

We think we should follow up this liberal construction, since it is evident that, if a location is made which a board of directors does not approve, they have the remedy in their own hands to change the same; and, since the construction of the line is a matter of physical and open notoriety, it is evident that no fraud could for any length of time be perpetrated; and, if no objection is made within reasonable time, it is fair to assume that the location meets the approval of the directors and other officials interested.

It is said the trial judge committed manifest error in refusing to petitioners their constitutional right to a trial by jury of the issues raised in their answers.

This question of the right to a trial by jury of the preliminary questions involved in the right to con--

demn has been considered by this court in two un-reported cases—one of *Morrison* v. *Mayor and City Council,* and the other, the case of *Bithall Howard et al.* v. *The Mt. Pleasant Southern R. Co.,* in both of which it was held that the question was one for the court, and not for the jury; basing the holding upon reason and the authority of the cases of *McWhirter* v. *Cockrell,* 2 Head, 10; *Evans* v. *Shields,* 3 Head, 70; *Scudder* v. *Trenton Delaware Falls Co.,* 1 N. J. Eq., 694 (23 Am. Dec., 756); *Savannah* v. *Hancock,* 91 Mo., 54 (3 S. W., 215); Thompson on Trials, sec. 1508; *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S., 234 (17 Sup. Ct., 581, 41 L. Ed., 979).

It is said that, while this may be a correct rule as to general application, still, there may be cases where facts are involved in this preliminary question which it is proper and requisite should be submitted to a jury. In other words, the argument is that, so long as the right involves what are called "political ques-tions," such as the propriety of a public improvement, or the necessity of taking property for such improve-ment, the question is one for the courts, and not for the jury, but, when facts are involved upon which the right to take is based, it is a question for a jury, as when the improvement proposed is outside of the scheme of the charter.

But we think the distinction attempted to be set up is not applicable in this case, if at all. It is the duty of the court to construe the language of the

Tennessee Central Railroad Company v. Campbell.

charter; and while facts may, to some extent, be involved in the preliminary question, they are not involved any more in a case like the present one than they were in the Bithall Howard case, where the question was whether the enterprise was one prosecuted in good faith, or was a mere sham.

Upon the whole record, we are of opinion the defendants have not made out a case to warrant the court in refusing to allow their lands to be condemned for the purposes of the railway company, and the petition is dismissed. As before stated, the question of compensation to the defendants for the lands taken does not arise in this case.

The petitions are dismissed at the costs of the petitioners.