Niemeyer & Darragh v. Little Rock Junction Railway et al.

---

NIEMEYER & DARRAGH v. LITTLE ROCK JUNCTION RAILWAY ET AL.

1. CHANCERY JURISDICTION : *To restrain railroads from taking land for track, &c.*

Neimeyer & Darragh v. Little Rock Junction Railway et al.

Where the proposed action of a railroad company in taking land for its track is unauthorized, Chancery may restrain it by injunction.

2.    RAILROADS : *Proceedings to condemn right of way.*

The statutory proceeding to condemn land for right of way for railroads is special, to ascertain the compensation to be paid the owner for the land to be taken. No provision is made for any issue upon the *right* to condemn, and the owner can not in that proceeding question the legality of the corporation.

3.    CORPORATIONS :

Although the existence of corporations voluntarily organized under general statutes, can not be questioned collaterally, yet if they have resulted from fraudulent combinations of individuals to procure powers under circumstances, and for purposes not within the scope and purpose of legislative intent, and under shelter of their charter are about to exercise powers oppressive to an individual, they may be restrained by private suit of those injured or about to be.

APPEAL from *Pulaski* Chancery Court.

Hon. DAVID W. CARROLL, Chancellor.

*Caruth & Erb* for appellants.

The right of property, and its quiet enjoyment are higher than any Constitutional sanction. It is subject only to the taxing power and the State's right of Eminent Domain. These powers must be legally and Constitutionally exercised. *Const., Art. II, Sec.* 22. No one can be compelled to part with his property. 60 *Maine,* 290.

The statute only makes articles of incorporation presumptive evidence and hence may be enquired into by the courts.

A corporation conceived and created for fraudulent purposes is amenable to two classes of proceedings—By the Attorney General in behalf of the State—By a private individual, where private rights are directly affected·

*High on Injunctions, Sec.* 594. And a Court of Chancery will interfere to prevent irreparable injury or continuing trespasses. *Ib., Sec.* 411; 35 *Wis.,* 425; 1 *Dr. & Sm.,* 154; *Greene's Brices Ultra Vires, p.* 601; 18 *Mich.,* 212.

An injunction is not in the nature of a prohibition to courts of co-ordinate jurisdiction—it simply *restrains the parties. Story Eq. Jur., Sec.* 875.

Contend that the L. R. Junction Railway has perpetrated a fraud upon the incorporation laws of the State; that it is not, and is not intended to be, a railroad company, but a Bridge Company, attempting to evade the revenue laws of the State and secure exemption from taxation, &c., &c.

An injunction ought not to be dissolved merely because equity is defectively stated, nor upon a question of law, unless plain beyond a reasonable doubt. 3 *Tenn. Ch.,* 338.

See particularly case of *Cent. R. R. v. Penn R. R.,* 31 *N. J. Eq.,* 475, which is precisely in point.

*John McClure* for appellees.

Injunction will not lie to prevent the commission or repetition of a trespass, when there is an adequate remedy at law. 11 *Ark.,* 304. There must be something particular or special, for which a court of law cannot afford relief. 8 *Geo.,* 118; 35 *Ala.;* 599; 9 *Gill & J., (Md.)* 468.

Condemnation proceedings are *special proceedings,* under the statute, and equity will not interfere, 5 *Abb. (N. Y.)* 171, even on the ground of irreparable damages. 66 *Penn. St.,* 155.

If the Defendant Junction R'y Co. *is a corporation,* it has the right to pursue the statutory remedy for condemnation—*if not,* the complainants can show that fact in the court of law as well as in equity. See 18 *Barb.,* 222;

8——43

16 *Fed. Rep.*, 522 ; 134 *Mass.*, 593 ; 11 *Paige*, 384 ; 34 *Ill.*, 378 ; 11 *Iowa*, 523.

" Owners of land not being shareholders, and not having contracted with the Co. as a corporation, may deny the existence of a corporation." 37 *Cal.*, 354 ; 10 *R. I.*, 144 ; 5 *Ohio St.*, 276 ; 15 *Oh., St.*, 21 ; 57 *Md.*, 267 ; 33 *Oh. St.*, 429 ; 45 *Penn., St.*, 81 ; 14 *Cal.*, 424 ; 72 *N. Y.*, 245 ; 46 *Md.*, 372 ; *Boyce v. M. Church,* 75 *N. Y.*

If there is no such corporation, *Quo Warranto* would not lie, 78 *N. C.* 57 ; 5 *Iowa,* 366, and if not, how can this action be maintained ?

The fee of streets and alleys being in the city, a court of equity will not at the suit of an individual, enjoin a Railway Co. from operating its road laid without permission, but will leave the redress to the public authorities. 75 *Ill.,* 588 ; 23 *La. Ann.*, 535.

When large and extensive works are sought to be stopped, it should clearly appear that it is a case for equitable intervention, and that there is no equitable remedy at law. 54 *Penn. St.*, 164 ; *Ib.*, 401.

The charge is, not that the *Company* is not duly organized in accordance with law, or that it is abusing its powers, but that the *corporators* have practiced a fraud on the *law.* Admitting this to be true, the *Company* cannot be held responsible for the fraud of the *corporators.* The condemnation is not sought by the *corporators* but by the *Company.* 33 *Oh. St.*, 436.

The State for the fraud, if one has been perpetrated, may proceed by *Quo Warranto.* 53 *Cal.*, 694.

EAKIN, J. Appellants own a half block of ground in Little Rock, lying on the North side of an alley dividing the block, and consisting of lots numbered from 1 to 6, inclusive. It has, along its river front on the North side of

the block, a railway track, being part of the line of the defendant Company, the "Little Rock, Miss. River & Texas Railway." Upon the opposite side of the Arkansas River, the line of the defendant Company, the "Little Rock & Fort Smith Railroad Company," comes in to its Eastern terminus at the town of Argenta. Up to the time of the proceedings involved in this suit there had been no connection between the two roads.

The defendant the "Little Rock Junction Railroad" was organized recently, under the general act of the State, for the avowed purpose as expressed in the articles, " of building, operating, maintaining and owning a line of railroad, with all the necessary turnouts, side tracks, turn-tables, depot station houses, switches and all things thereunto appertaining ; commencing at some suitable point east of Commerce Street in the City of Little Rock * * * where a connection may or can be made with the line of road of the Little Rock, Miss. River & Texas Railway, thence in a northwesterly direction on the most practical route, across the Arkansas River to a point at or near Baring Cross * * * where a suitable connection may be made with the Little Rock & Ft. Smith Railway." In obtaining this charter it seems that all the forms prescribed by the act were followed, and all the requirments of the act fulfilled. The Company stands *prima facie* as a proper corporation, entitled to all the rights and franchises granted by the general act.

In locating its track, the Junction Company proposed to to pass along the alley on the South side of the lots, and obtained a grant of the privilege from the municipal authorities of the city. It required also the use of the lots for its proper purposes, (if its franchise be valid), and commenced proceedings in the Circuit Court, under the statute, for their condemnation to its uses. The proceedings being likely to retard the prosecution of the work, the Circuit Court, under

Sections 4950-1, of Gantt's Digest, directed that the sum of $5,750 be deposited by the Company in the German Bank subject to the order of the court; providing that then "it shall and may be lawful for the petitioner to enter upon the property herein described, and proceed with its work through and over said land prior to the assessment and payment of damages, as is provided by " said Sections. The deposit was made, and the certificate thereof filed in court. What further progress towards the assessment of damages in that court has been made, the transcript does not disclose.

Appellants brought this bill afterwards to enjoin the prosecution of the work along said alley, and the taking of the lots, alleging that the organization of the Company was a fraud upon the State in this: that it was not a bona fide Company organized to build and operate a railroad as pretended, but in effect a Bridge Company; taking the guise and semblance of a Railroad Company for the purpose of building, using, and deriving revenue from the bridge with the exemption from taxation accorded by statute to the bridges of railroads; that in truth the bridge is to be built, used, and controlled by the two old Companies, which for that purpose have combined in a colorable scheme, to set up a pretended separate Company, to accomplish a junction, and enjoy the revenues of the bridge.

Some of the specific allegations are that the two older companies are under the same management, forming together one road which is directed and controlled by the same parties; that the incorporators of the Junction Company filed their articles at the instance of the old companies; that the proposed road is to be only about two miles long; that the articles are silent with regard to a bridge; that they are claiming to assert franchises for the purposes of a bridge, which a bridge charter would not have conferred; that the incorporators of the Junction Co. are stockholders, officers, or employes, of

one or the other of the old Companies, and that its capital stock is " largely held by, or in trust for, persons owning large amounts in, or largely concerned in their management: that the old companies paid for the surveys, estimates, plans and specifications for the bridge and its approaches ; deposited the fees for the articles of incorporation ; and are now through their general offices disbursing all the expenses of bridge construction ; further that, simultaneously with its incorporation, the Junction Co. before beginning work, conveyed the road and bridge about to be built, to two gentlemen in Boston who were stock holders and officers in the old roads, in trust to secure a proposed bonded indebtedness of $400,000, with interest at 7 per ct.; that at the same time, with the execution of this trust deed and in connexion with it, the three companies entered into a contract in writing by which control of the bridge property was given to the old Companies, which, on their part bound themselves, with other things, to guarantee, or provide for the payment of the interest on said bonded indebtedness; further, that said bridge is intended for foot passengers, vehicles, and general use, to serve the purpose of a common highway, as regards modes of travel.   Further, that in order to reach the bridge at the point selected, the Little Rock, Miss. & Texas Road is obliged to build a line for some distance in the city, parallel to its present track, which new line it would not have authority of itself to build, and that it thus became necessary to resort to an application to the city authorities by a new company.

The injury apprehended by appellants is represented thus : that their lots are of great business value; that a line through the alley, with the river front track already built would so hem in the lots as to make them inaccessible and inconvenient for the despatch of business, thereby diminishing the market value.   They show further the commence-

ment of the proceedings for condemnation, and allege that the Junction Railway has never offered them a reasonable compensation for the lots or the right of way over them.

They pray that the Junction Company be enjoined from laying the track through the alley, and from entering upon and using the lots.

An injunction as prayed was ordered by the Judge of the County Court, issued by the Clerk, and duly served. The General Manager of the roads disregarded it, and proceeded to lay the track along the alley. On the 15th of August, 1884, a rule was made upon him by the Chancery Court, to appear and show cause why an attachment should not issue against him for contempt. He responded, setting up want of notice of the application for the injunction, and want of authority in the County Judge to order it, inasmuch as it did not appear that the Circuit Judge was absent from the county, either by the complaint or any other paper; also setting forth the order and authority of the Circuit Court to proceed with the work, on making the deposit; and the authority of the city council to use the alley. The Chancellor held that he was not justified thereby in disobeying the injunction, although he was of the opinion that the writ had been improvidently and irregularly issued. The Manager was let off upon payment of all the costs arising out of the issuing of the injunction, and the proceedings for contempt.

Appellants then prayed that the injunction be extended so as to restrain the defendants from further prosecution of the proceedings in the Circuit Court for condemnation of the lands.

On the 8th Sept., the petition for a restraining order was heard and dismissed. The appellants announced that they would stand upon their complaint. It was

therefore ordered that the injunction which had been issued be dissolved, inasmuch as it was improvident, and the track had already been laid along the alley. The bill was dismissed. for want of equity, and an appeal granted.

An ancillary injunction as prayed below has been made by this court to hold all matters *in statu quo*, while the case is being considered. It has been advanced as involving interests of great public importance and the whole matter submitted.

The injury impending over the real property of appellants is of a permanent and material nature. Something more than a mere trespass by an intruder which may be compensated, or punished for example, leaving the property in as good condition as formerly. Lots closely confined by railroad tracks on both sides, front and back, are ill suited to business purposes, much less for residences. Of course the permanent damage would be greater if the lots themselves should be condemned. If the proposed action of the Junction Railroad Company be unauthorized there can be no doubt of the power to arrest it by injunction. Real estate has always been thus protected. Partly from the original feudal sentiment, and partly from its intrinsic nature, all real estate is considered as having a peculiar value to its owner, as being the subject of local affection. No one piece of land is in law as good to the owner as another piece of the same value. In truth, no two pieces are alike. Hence the market value of land before and after injury, affords no just measure or criterion of compensation for a wrongful act, affecting it permanently. Nor is it at all clear to our minds, that the appellants have a full, complete and adequate remedy at law, to be obtained by way of defence to the special proceedings in the Circuit Court for condem-

*1. Power of Chancery to restrain taking right of way.*

Niemeyer & Darragh v. Little Rock Junction Railway et al.

nation.   The Junction Company, in all purely legal aspects, is a proper corporation, clothed with franchise of eminent domain to the extent of its necessities.   The proceeding under our statute, is a special one, directed solely to the object of determining the compensation to be paid the owner of property, proposed to be taken.   No provision is made for any issue upon the *right* to condemn. It could not be there pleaded that the Junction Co., was not a corporation.   To attack its existence collaterally is not permissible.   (See cases cited in Abbot's Dig. of Law of Corp. pp. 365 et seq.)   A plea in the nature of *nul tiel* corporation would not be safe in the face of complete articles of association.   If the objection were made on the ground of fraud in obtaining the franchise, it would still be true that the jurisdiction and proceedings in Chancery to relieve against fraud are more complete and effective than at law.

Besides, it is plain that the legislature never contemplated any such defence as a want of right to condemn in the corporation.   For where the proceedings are liable to delay, it is made the duty of the court to fix a sum to be deposited by the company, and to allow the property to be taken and used in anticipation of the settlement of damages.   That was done in this case, and appellees contend that the order allowing the Junction Co. to proceed and take the property is in the nature of *res judicata*, and cannot be now enjoined.

But the power to condemn the right to the franchise, was not a question at issue.   Further, with regard to corporations not acting under special charters of legislative grant, but voluntarily organized under general laws ; although their existence *as corporations* cannot be questioned collaterally, yet if they have resulted from fraudulent combinations of individuals to procure powers under

2. RAIL ROADS : Proceedings to condemn right of way.

3. CORPORATIONS : Fraudulent ; when restrained.

circumstances, and for purposes not within the scope and purpose of legislative intent, and the corporators, under shelter of their articles, are about to exercise powers oppressive to the individual they may be restrained by private suit of those injured or about to be. Fraud has no immunity anywhere, in any guise (*Patterson et als v. Arnold et als*, 45 *Penn. St.* 410; *Central R. R. Co., N. J., v. Penn. R. R. Co.*, 31 *N. J.*, (*Eq.*) 475.) This is the course that, in this case, has been pursued. We think the Chancery Court properly entertained the bill, and had jurisdiction to enjoin the Company if the merits of the case required that relief. The real question presented by the appeal, is this: Does the bill, taking as true all allegations of fact properly made, and discarding all vague and general language imputing fraudulent intent, make such a case as should invoke the interposition of a court of equity. In this consideration the nature and the extent of the damage, as being permanent and irreparable, cannot aid the bill. It results, if the company be a lawful one, from the authority of the State in the exercise of its right of eminent domain.

The statute provides that any number of persons, not less than five, being subscribers of stock in a contemplated railroad, may be formed into a corporation, for the purpose of constructing, owning and maintaining such railroad, by compliance with certain forms and requirements, which as above noted, have all, in this case been fulfilled. Amongst other powers granted, they are clothed with the right to take, and use, all lands and real estate " necessary for the construction and maintenance of the railroad and stations, depots and other accommodations necessary to accomplish the object for which the corporation is created, upon paying to the owner a compensation agreed to by the parties, or ascertained and paid or deposited as therein after provided. Pro-

Niemeyer & Darragh v. Little Rock Junction Railway et al.

vision is made for application by the company to the Circuit Court, when the compensation cannot be agreed on, to have the damages assessed by a jury of twelve men. They are empowered to construct the road upon or across any stream of water, water-course, road, highway, railroad or canal, intersected by the route, and to cross, intersect, join or unite it with any other railroad before constructed on any point on its route; and upon the grounds of such other railroad company, with the necessary turnouts, sidings and switches, and other conveniences, in furtherence of the object of its construction; and to borrow money to be applied to the construction of their road and fixtures, and the purchase of their engines and cars. In case of application to the court for assessment of damages it is provided that when the determination of the question in controversy is likely to retard the progress of work on, or the business of, the railroad company, the court, or judge in vacation shall designate an amount of money to be deposited by such company, subject to the order of the court, for the purpose of compensation afterwards to be fixed, and upon making said deposit it shall be lawful for such company to enter upon the land and proceed with the work. Further, it is expressly provided, that any railroad then, or thereafter chartered, under existing laws, may purchase, and hold any connecting road and operate it, or may consolidate their companies, and make one company. (See *Gantt's Dig. Title Railroads.*

By Act of Dec. 9, 1874, the purchasers of any railroad become invested with all its rights, franchises, &c., and might organize under the same, or a different name, with power to issue bonds whenever deemed expedient. This act was expressly supplemental to the general railroad act.

By Act of Feb. 28th, 1881, all railroads authorized to cross a river or stream are empowered to construct bridges over the same, adapted to highway purposes as well as to

the use of said road, with suitable approaches and ways ; or to sell, lease or otherwise convey to any corporation, organized for that purpose, the right to construct such bridge. Power was given to take tolls at fixed rates ; and the company building the bridge, whether the road company, or its lessees, were invested with the same rights and powers of condemning land and property, with other privileges and franchises as were then, or might thereafter be, conferred upon railroad companies, to be governed by the same proceedings.

Under the Revenue Act of 1883, Railroads in making their schedules of property for taxation, are not required to include, or value, embankments, tunnels, cuts, ties, tressels or bridges. They are thus exempt so far as these specifications are concerned, but are required to value all improve · ments, stations and structures including the railroad track.

Such is a brief view of the railroad legislation of the State in recent years, from which it is easy to perceive a prevailing policy to encourage not only their construction by separate companies, but their combination into continuous lines. It is a policy which our growing State demands, to keep her abreast of the march of improvements in other States, and to open to our farmers a speedy market with easy transportation, and a quick connection with the great marts of the nation. By these acts and in the light of this manifest purpose, the allegations are to be tested and viewed, so as to determine whether the company in following the letter of the law, and endeavoring to avail itself of its grants and immunities, has been guilty of anything intended or directed to contravene this policy. If there has been no fraud upon the State, there can be none predicated on hardship to individuals. Every citizen is required to yield to the right of eminent domain, and be satisfied with compensation, whenever the right to exercise that right has been lawfully acquired.

Through the bill, and its own judicial cognizance, this court is advised that the Ft. Smith road runs from the extreme Western border of the State, at a point accessible from the Indian Territory by a navigable river, thence South-westerly through the middle of the State to a point on the Arkansas River opposite Little Rock. In Little Rock begins the Little Rock, Mississippi River & Texas Road, continuing the same course, South-westerly, to the great water artery of commerce, the Mississippi. Separated, these two roads failed of that full accommodation to the wants of the people which it was the manifest design of the legislature to meet and afford, by its liberal legislation. United, they would open to both sections uninterrupted communication with New Orleans and the Eastern Southern States, which would be available to large numbers of citizens, invite the settlement and improvement of waste lands, and develop the latent wealth of the State. The gap about two miles long, required to be closed by a railroad. It was difficult to conceive how a mere toll bridge would have served the public necessity, with the best approaches for vehicles, horsemen, cattle and foot passengers. It would have been comparatively a mere local convenience for the residents of Little Rock and those upon the north side of the river near enough to come to the city in vehicles. No great public purpose, affecting the mass of citizens would have been subserved. This was, of course, apparent to the two railroads, whose managers and owners saw also in a junction railway their own best interests. They had a right to look to those interests and promote them by legitimate means. Their own charters did not allow them to construct the junction. But that does not seem to afford any clear reason why they should not encourage, promote and even aid, another company in obtaining a separate charter, and

afterwards even buying out the franchises of the new company, if they felt disposed. This would not be in contravention of the State policy, but, it seems to us, rather in aid of it.

The law does not prescribe any maximum or minimum length of the road. It certainly is not a fictitious railway. It is not denied that one is in process of being built. But it is only alleged that the present corporators never mean to equip and run it. But it is not alleged that they mean to abandon it after it is built, or that it will not, *bona fide*, afford the people the conveniences of transportation which they have a right to expect in return for the grant of franchises by the State.

The corporators are individuals, and make a Company separate and distinct in law. They propose doing what their charter expresses. Even though most or every one of them were officers or closely interested in the old roads, they have nevertheless the right to become members of a new and distinct corporation, and may legally be vested with distinct franchises. Concede that they acted at the instance of the old roads, their right is none the less. Business men in their enterprises constantly act at the instance of others for their mutual benefit. It is rather commendable to do so.

If as a road the Junction Company acquired the right to make its road over the Arkansas a public highway, and take general tolls, and to hold this bridge property without valuing it to be taxed, who is defrauded? It is done by grace of public law, binding both State and County. It is a concession to induce just such enterprises. Neighborhood toll bridges have not the same public and general importance as those which keep open great arteries of commerce, through which may pulsate the trade and travel of many States. There is a reason for the distinction. We think it cannot

be taken as a badge of fraud that this Junction Company availed itself of this advantage. What the law openly and avowedly allows is right.

The Junction Company had the right to borrow money for its construction, and to issue its bonds. Conceding that the old Companies furnished the money, and acquired the right, or endeavored to do so, of controlling the Junction Co. for its security, that would not render the Junction Company fraudulent in its inception or vitiate its articles. Whether or not the old Companies transcended their powers in entering upon an enterprise germain to their purposes, is a matter between them and the State, or between their officers and stock holders and those dealing with them. It cannot affect the right of the Junction Company to exercise its right of condemning and taking lands for its own construction. It only goes to show that the old Companies had a great interest in the completion of the Junction Company, and expected to derive great benefit from it. But no burden is thereby surreptitiously and fraudulently imposed on those whose property is taken, greater than would have fallen upon them, if the new Company had been organized by capitalists who were strangers to both the old roads.

We have carefully examined the case of the *Central Railroad Co., of New York and others v. The Pennsylvania Railroad Company and others, Supra.*, which has been earnestly pressed upon us by counsel for appellants. In many respects it is strikingly like this, and an injunction was granted. There are however points of difference, one of which is commented on by the court. It is that the Junction Company was organized in the interests alone of a private corporation, a storage company, to afford access to their docks, and that it seriously interferred with the business of a great railroad organized for the public benefit. The propriety of an injunction depends much upon the particular circum-

stances of each particular case. It is not a matter of strict right but of some discretion.

We have not before us the whole of the legislation of the State of New Jersey upon the subject of railroads. There is an intimation in the opinion that the law could not be applied to affect purely private purposes. It was conceded in that case by the affidavit of the President of the Storage Company that the projected road which ran from its docks to the line of the New Jersey road was merely its own private enterprise. We do not deem deem it nec-essary however to seek points of distinction, in order to decline making the opinion of the learned court of New Jersey a guide in the decision of this case. Each State has its own policy, and it is the duty of its courts to carry it into effect.

The policy of this State in encouraging the building of new roads is extremely liberal. It is also an avowed policy to encourage the connection of old roads to make continuous lines. All the great marts of commerce lie without our borders, and this is essential to the prosperity of our people.

To close the gap, between the roads terminating one at Fort Smith and the other at Arkansas City, far down the Mississippi on the way to New Orleans is a work of vast importance. It is a commercial necessity, if the people above Little Rock are to have fair means of competing in their products with those below. Such a road interferes with no other franchise of equal public importance. It should be a very clear and palpable fraud, which would jus-tify the courts in stopping this work at once, and perhaps forever. It is not at all probable that a mere bridge com-pany will ever be organized, and it would not without just such co-operation with the railroads, which it was charged was fraudulent in the Junction Company, be of commercial importance to the majority of citizens. The companies

Cauthorn v. State.

charged with fraud in promoting and aiding the Junction Company, are public corporations for public convenience, which convenience will be largely increased by what it is charged they propose to do. That they should have the in centive of private emolument from increased business is simply necessary to human activity.

Viewing this case under all its peculiar aspects, we are of the opinion that the Hon. Chancellor did wisely in refusing the injunction. The dismissal of the bill without formal demurrer, or leave to amend, was it seems in accordance with the wish of appellants, to hasten an appeal and final settlement. It is irregular practice, but, under the circumstances, no ground of reversal. Affirm.