## BRIDWELL *v.* GATE CITY TERMINAL COMPANY.

1. That a commercial steam railroad for the common carriage of freight and passengers will be only about three miles in length, and will, for a considerable part of its course, lie within the corporate limits of a city, and that it will connect with other steam railways at the outer terminus, does not prevent it from falling within the purview of the general laws for incorporating railroad companies.

2. If it were a question of doubt as to what was the real character of a corporation, its name might be considered to throw light on that subject. But that a company is called a terminal company will not change its character, if it is a railroad company within the meaning of the law.

3. The road now proposed to be built, being only about three miles in length, does not fall within the restriction contained in section 2176 of the Civil Code.

4. A charter obtained from the State for the purpose of constructing and operating a commercial railway as a common carrier is granted for a public purpose. It can not be used for a purely private purpose. Nor can the company so chartered exercise the right of eminent domain for a mere private purpose.

5. Where a railroad company was incorporated under the general law, with power expressed in the charter to construct a railroad from a point some distance outside of a populous city easterly to a point at or near the center of the city, if the power to locate the terminus and line and exercise the right of eminent domain could be conferred by the directors on the president, yet under a general authority to manage the business of the company subject to the approval and direction of the board of

directors, or its chairman or committee, conferred by the by-laws on the president, he could not lawfully fix such route and terminus and proceed with condemnation proceedings, before such approval.

6. Where a notice, as the commencement of condemnation proceedings, was given by the president's direction, without lawful authority, and the time had expired, under its terms, for the appointment of an assessor by the landowner, the directors could not, by ratifying the act of the president, cause such ratification to relate back and give such notice the same effect which it would have had if it had been legal when given.

7. Where the charter of a railroad company fixed one of its termini at a station some distance outside of the corporate limits of a city, and described the road to be located as running easterly to a point at or .near the center of the city, but in fact a line run due east would not .enter the city at all, the corporation had a discretion to locate the ·other terminus at a point within the city, at or near its center; and where a line was located from the initial point to the terminus so fixed, running in a general southeasterly direction, this was not a violation of the charter; and condemnation proceedings instituted on the line so located were not void for that reason.

8. If a real-estate agent representing a railroad company informed a lot owner that the company desired her lot for the purpose of the right of way and freight yard, and made her an offer which he testified was a fair price for the property desired, and which she refused to accept, this would be a sufficient negotiation, within the meaning of the statute, before the commencement by the company of condemnation proceedings.

9. If the plaintiff be the owner of a lot abutting on a public street, it will not require the proceedings to condemn her lot for railroad purposes to be enjoined on the ground that the company has not condemned such interest as she may have in the street, or acquired the right to cross it.

10. The issues of fact were passed on by the presiding judge so far as they affected the application for an injunction; and there was sufficient evidence to authorize his finding in respect to them. The judgment refusing the injunction is reversed solely on the ground that the plaintiff is entitled to be served with a notice of the intention to condemn her property, lawful when given, and thereafter to have the time provided by the statute for appointing an assessor.

Argued December 19, 1906.—Decided March 1, 1907.

Petition for injunction. Before Judge Pendleton. Fulton superior court. October 27, 1906.

*Mayson & Hill,* for plaintiff.

*Rosser & Brandon,* for defendant.

LUMPKIN, J. The substantial questions in this case may be grouped under two general heads: (1) Is the defendant a railroad company within the meaning of the general law providing for the incorporation of such companies, and has it the power as a railroad

company to condemn the plaintiff's land? (2) If so, is it proceeding to use such power for an unlawful purpose, or to exercise it in an unlawful manner?

1. Let us first consider whether the defendant is a railroad company within the meaning of the general law touching the incorporation of such companies. The subject of the incorporation and power of railroad companies under the general law is dealt with in the Civil Code, §§2159-2179. Section 2160 provides that any number of persons not less than ten, who desire to be incorporated for that purpose, may form a company; but before receiving a certificate of incorporation they shall file a petition in writing, addressed to the secretary of State, in which shall be stated certain things in regard to the probable length, "general direction," capital stock, etc. Before the secretary of State issues a certificate of incorporation, he must satisfy himself that all the requirements of law, prior to the filing of the petition, have been substantially complied with; "and any certificate or duplicate thereof issued under this article by said secretary of State shall be conclusive evidence of the existence of such corporation in all the courts and places in this State, and of a compliance with all the requirements of this article." Civil Code, §2162. There is no contention but that the requirements above stated were duly complied with, and that the secretary of State issued a certificate of incorporation. It can not be doubted, therefore, that the company is duly incorporated, if the secretary of State had power to charter it. Under the Civil Code, §5780, all charters of railroad companies must be granted by the secretary of State. It is argued that the railroad will only be some three miles in length, and that this was not such a railroad as was contemplated by the general incorporation laws. The Civil Code, §2166, provides that the corporate powers and privileges shall cease at the expiration of two years from the date of the certificate of incorporation, "if at the expiration of said two years said company has not constructed, equipped, and are operating the same for at least fifteen miles of said road, or the entire road if the same be of less length than fifteen miles." This contemplates that there may be railroads more than fifteen miles in length, or less than that length. This is again recognized in the act of August 17, 1903 (Acts 1903, p. 34), which authorizes the secretary of State, for cause shown, to grant an extension of the time for such con-

struction. In this act it is implied that a railroad company may be incorporated to build less than ten miles as the entire road. This is clear from the use of the expression, "and such relief shall not be granted to any corporation which had not graded at least ten miles of its roadway at the time of the arising of such cause for forfeiture, or the entire roadway if the same be not so long as ten miles." No minimum limit as to length is fixed by the statute. In defining a common carrier as "one who pursues the business constantly or continuously, for any period of time, or any distance of transportation," the code does not indicate any length of road which the company must have in order to be a common carrier. Civil Code, §2264. It is possible that a charter might not be granted to operate a railroad a few feet in length, or for so short a distance that it would be practically impossible of operation as a common carrier; or if a charter should be granted, it is possible that the courts might hold that such a venture was not a genuine railroad within the meaning of the law, so as to condemn property. But it can not be said, as matter of law, that merely because a commercial steam railroad will only be about three miles in length, it will be no railroad at all. On this subject see 1 Lewis on Eminent Domain (2d ed.), §170, p. 435; National Docks R. Co. v. State, 53 N. J. L. 217 (21 Atl. 570 (10) ); Niemeyer v. Little Rock Ry., 43 Ark. 111; Collier v. Union Ry. Co., 113 Tenn. 96 (83 S. W. 155); State v. Martin, 51 Kans. 462 (33 Pac. 9); Long Branch Commissioners v. West End R. Co., 2 Stew. Eq. 566; National Docks R. Co. v. Central R. Co., 5 Id. 755, 766. While the question now under consideration was not then directly involved, yet a company incorporated under the general law to construct and operate a short belt line railroad near the eastern boundary of the city of Atlanta was dealt with in *Georgia R. Co. v. Maddox,* 116 *Ga.* 67, 68 (1), and treated as having the power to acquire by condemnation land necessary for its construction.

It is suggested that one terminus of the road which is sought to be chartered is at a point not far from the corporate limits of the city of Atlanta, and that most of the road will lie within the city. But if it is a railroad within the meaning of the law, the fact that much of it will lie within the corporate limits of the city will not prevent it from still being a railroad. 1 Lewis, Eminent Domain (2d ed.) §256 (latter part on p. 599) ; Wiggins Ferry Co. v. East

St. Louis Ry. Co., 107 Ill. 450, and cases above cited. Nor does the further fact that the road will connect at the terminus outside of the city with other railroads destroy its own character as a railroad. Our code requires railroads to sell tickets over connecting roads (Civil Code, §§2299, 2300), and to receive from connecting roads cars containing freight assigned to any point on its road. (Civil Code, §2302).

In the case of Niagara Falls Ry. Co., 108 N. Y. 375 (15 N. E. 429), a railroad company was organized under the general railroad law for public use in transporting persons and property between certain termini. It appeared, however, that the road proposed to be built was not connected with any other railway, and could only be reached by parties over the lands of the State or of private individuals; that there could be no habitations along it and no freight traffic over it; that the sole business was to convey sightseers to points of interest along the Niagara river; and that its season of operation was confined to four months in the year. It was held, that, looking beyond the formal document of incorporation, the actual business proposed to be conducted was to construct and operate a road which had no proper termini and was not a highway in any just or corporate sense; and that the case did not "differ in principle from an attempt on the part of a private corporation, under color of an act of the legislature, to condemn lands for an inclined railway, or for a circular railway, or for an observatory, to promote the enjoyment or convenience of those who may visit the Falls." This is very different from a steam railroad to be operated as a common carrier of goods and passengers connecting with other railroads, though the line be short.

2. It is said that this corporation is a "terminal company," and not a railroad company. The expression "terminal company" has not received any judicial construction in this State. There is no provision of law dealing with such a company by that name, or classifying it as to incorporation. If it is incorporated for the purpose of building and operating a commercial railroad, though short, as a common carrier, it must be incorporated as a railroad company and obtain its charter from the secretary of State. It may be better for a company which seeks a charter as a railroad company to so describe itself in its name. If it were a question of fact whether a particular company was a railroad company or

not, and one admitting of doubt, the name selected might have some evidential bearing upon that question. But we can not see how, as matter of law, it can be said that a company incorporated for the purpose of building and operating a railroad three miles in length for the carrying of goods and passengers can be said to be no railroad company at all because it selects the name of "Terminal Company."

3. The code provides that "if another railroad is already constructed, or route selected and chartered between said points, the general direction and location of the railroad shall be at least ten miles from the railroad already constructed or laid out and selected to be constructed; but this section shall not be construed to refer to any point within ten miles of either terminus, or to prevent said roads from running as near to each other for the first ten miles from either terminus as the interest of such company building the new route may dictate." Civil Code, §2176. As this road will only be about three miles long, it does not fall within the prohibition. It is urged that if a railroad can be chartered and constructed for a distance of ten miles so as not to fall within this restriction, and then another section of ten miles or less can be chartered, by successive charterings the whole law may be evaded and a long, continuous line of railroad may be built within less than ten miles of an existing road and practically parallel to it throughout its length. When such a scheme or attempt to evade the general incorporation law is presented to us, we will deal with it. But in the present case there is no allegation or proof that there is any such purpose or attempt, and the suggestion is merely as to a possibility that the general incorporation law might be thus misused.

4. Again, it is argued that this company will acquire a right of way and will then convey or lease it to other railroads, and that this can not be done without the assent of the legislature. If it is meant that the company can not be organized under the guise of a railroad company merely to buy and sell or lease realty, to speculate in land, or the like, this of course can not be done. A railroad is not a mere trading company or speculating company. But if it is meant that the company may build its road but may thereafter at some future time "sell, lease, assign or transfer its stock, property and franchises to, or consolidate with," some other

railroad company whose road connects with or forms a continuous line with it, this is authorized by section 2179 of the Civil Code, where not contrary to the constitution. See also Civil Code, §§ 1865, 2173, and amending acts. If the legislature desire to limit or modify this law, it is for them to do so.

It is contended that the franchises and property acquired are to be used for private, not public purposes. It is undoubtedly true that the franchises contained in a charter granted to a railroad company for public purposes can not be used merely for private purposes. Thus where a street-railroad company was chartered for the purpose of constructing and operating cars for the use of the public, it was held that, under the charter provisions, the municipal authorities could authorize the propelling of cars through the streets by steam for public use, but they could not do so for private use merely to haul coal for a manufacturing company. *Mayor of Macon* v. *Harris*, 73 *Ga.* 428. But this does not mean that a commercial steam-railroad company can not lease its line to another such railroad company, if the lessor has the right to make the lease, and the lessee to take it. Nor does it mean that the company can not haul the cars of another like company over its line. All, or practically all, through travel and traffic over several connecting lines of railroad is done by some arrangement by which one company receives and carries goods or cars delivered to it.

The owner of real estate has no opportunity to be heard upon the application for the charter of a railroad company. He is not interested until some right or property of his is affected or sought to be condemned. When this happens, he has a right to be heard as to whether his property is in fact to be condemned or taken for public or private use. How far the question of necessity will be investigated by a court of equity has not been definitely decided in this State. Clearly, however, the court will not take the place of the company, and select the route for it. See on this subject *Mayor of Macon* v. *Harris*, 73 *Ga.* 428, supra; *Atlantic R. Co.* v. *Penny*, 119 *Ga.* 479; Williams v. Judge, 45 La. Ann. 1295; Edgewood Railroad Company's Appeal, 79 Penn. St. 257; *Savannah Ry. Co.* v. *Postal Telegraph-Cable Co.*, 115 *Ga.* 554; *Savannah Ry. Co.* v. *Postal Telegraph-Cable Co.*, 112 *Ga.* 941; 1 Lewis on Eminent Domain (2d ed.) §§ 238, 239, 286. In determining whether the use to which it is sought to appropriate land of a property owner

is a public or a private use, all the facts and circumstances throwing light on that subject may be considered, and the mere fact that the company may have a charter to build a railroad, regular on its face, is not conclusive as to the question of the purpose for which the property is actually sought to be taken. An instance where the court held that it was competent to show that those operating under cover of a railroad charter had no intention to use it for that purpose, but that the real effort was to continue the warehouse business of another and defunct railroad, or merely to speculate in land, and that the real object was to "expropriate" property, which it was seeking to obtain, for purely private purposes, will be found in New Orleans Terminal Co. v. Teller, 113 La. 733 (37 So. 624, 38 Am. & Eng. R. Cas. 64). We need not discuss this case further than to say that it is quite different in its facts from the one before us, and that in the present case the presiding judge has decided against any such contention.

Several other allegations are made by the plaintiff with a view to showing that the purpose for which her property is to be taken is private, and not public; such as that the company was organized for speculative purposes; that it will be unable to operate as an independent railroad; that the charter is being misused, etc. So far as these contentions·involve issues of fact, they were passed on by the presiding judge in refusing to grant an injunction, and we can not say, under the evidence introduced, that he abused his discretion in finding against them.

5. The by-laws contained the following provision as to the power of the president: "It shall be the president's duty, in the event there is no chairman of the board of directors, or in the absence of such chairman, to preside at the meetings of stockholders and directors. He shall sign all certificates of stock of the company, and such other instruments as he is authorized or directed to sign by the board of directors, or its committee. He shall appoint and discharge all employees or agents of the company, subject to the approval of the board of directors, or its chairman, if any, to which such power or approval may be delegated by it; he shall have general charge of and supervision over all the business of the company and over its employees and management generally of the business and affairs of [the] company, subject to the approval and direction of the board of directors, or its chairman or

committee as aforesaid; and he shall do and perform all acts inci-
dent to the office of president of the company, or as may be directed
by the board of directors, or its authority. The president, or the
person acting as such, may suspend or remove any officer or clerk
or other employee of the company, and make appointments to fill
the vacancy, subject to the ratification by the board of directors."

It is argued that the power to locate the route and terminus and
to exercise the right of eminent domain delegated by the State to
a railroad company can not be delegated by the directors to the
president, but must be exercised by the board of directors them-
selves. This is broadly stated in some of the text-books. See
Lewis on Eminent Domain (2d ed.) §243, p. 575; Raldolph on
Eminent Domain, §104, p. 95, and Baldwin's American R. R.
Law, 51, 56. An examination of a number of the cases cited by
them indicates that they were from States in which there were
statutes which to a greater or less degree may have affected the
decisions. Other text-writers and courts lay down in more general
terms the rule as to powers of directors which they can not dele-
gate. 1 Wood's Ry. L. (2d ed.), §154, p. 462; 3 Elliott on Rail-
roads, 919, 920. Green's Brice's Ultra Vires, 490. And other
decisions declare that the power of eminent domain can not be
delegated. Lyon *v.* Jerome, 26 Wend. 485 (37 Am. Dec. 378),
where several strong opinions were delivered.

It is urged in reply that this rule prevents only a delegation to
a different person, as, for instance, a contractor, or another com-
pany, and not the authorizing of officers or agents of the company
to exercise the power in the name of such company. It is unneces-
sary for us to decide whether, under our general laws touching the
incorporation of railroad companies, where the charter fixed one
terminus not far from the limits of a city, and authorized the
company to fix the other at or near the center of such city, the duty
of selecting the inner terminus and the route devolved on the di-
rectors as a quasi judicial or discretionary power, or whether they
could delegate this and the power to exercise the right of eminent
domain to the president. We leave that question open, and do not,
by what is herein stated, intimate an opinion that such power could
or could not in a proper manner be delegated. Of course, the di-
rectors would not be required to do the physical surveying or minis-
terial duties in carrying out condemnation proceedings, but the

question stated has reference to the power of choice or determination. If the power to so locate the line and terminus and to exercise the right of eminent domain can be conferred by the directors on the president, it must be clearly done, and it would not arise merely from a general power given in the by-laws to the president to conduct the business and affairs of the company, "subject to the approval of the directors," their executive committee, or its chairman; at least not before such approval. This is not a question of holding a principal liable for the contracts or like acts of an agent within his real or apparent. authority, or of ratification of such acts, but of the exercise of the power of the State to condemn property, delegated to the company. The law in regard to the exercise of the right of eminent domain must be strictly followed. Under the express provisions of the power given to the president, if the authority granted to conduct the affairs of the company generally be construed to include the power to exercise the right of eminent domain, it was subject to "direction and approval." If before such approval or direction the president could proceed to exercise the right, would the property owner be bound and the company not? Could they approve or disapprove as they chose, while he could not? Under such a power, a location by the president and proceedings to condemn property, without more, would not be lawful. When a report of the route and of what had been done, with maps or plans, was laid before the directors, showing, among other things, the property of plaintiff which it was proposed to condemn, and they approved it, and confirmed and ratified the acts of the president and authorized him to proceed with the condemnation, from that time it became the action of the directors. In this case the stockholders also passed resolutions of confirmation and ratification. Under this view we need not discuss the case of Tennessee Central R. Co. v. Campbell, 109 Tenn. 655 (73 S. E. 112), strongly relied on by the defendant in error, further than to say that there was evidence in it of action by the directors (formal or informal) and that the general manager had submitted maps to the directors which were approved and became part of the company's records.

The evidence shows that by direction of the president, a notice was given to the plaintiff of an intention to condemn her lot, which also informed her of the assessor named by the company and the time set for a meeting (to wit, August 30), and requested her to

appoint an assessor on her part to meet with the one appointed by the company and to determine the damages in accordance with the statute. It was served on her on August 14, 1906. The present equitable petition was filed August 30. On October 11, a direc- tors' meeting was held, to which the president made a report show- ing how the line of the company had been surveyed and located, submitted a plan of the freight yards and proposed location of the depot and tracks prepared by an engineer, and stated that he had approved the plan. The directors passed a resolution ratifying, approving, and confirming the action of the president and engi- neers of the company in locating the line of its railroad, the local freight yards, freight houses, and general yards as fully as if it had been specially authorized. It was also declared that if the line so located could be construed as a change from the general direction and route of the company as stated in the original petition, such general direction and route were changed accordingly. The pres- ident was authorized to take all action necessary to carry into effect the plans and to acquire all land and property necessary to do so. The action of the president in causing condemnation proceedings to be begun, and the action of real-estate agents in previously mak- ing an offer for the property under the direction of the president, were confirmed and ratified, and the president was authorized to proceed. Other features of the resolution need not be here set out, as they are not involved in this case. On the same day the stock- holders passed similar resolutions. Upon the passage of the resolu- tion confirming the route as laid out by the president, this became the action of the directors, and we perceive no reason why it was not then good, and none has been shown to us.

7. A serious point of controversy, however, is as to whether this action of the directors, taken more than a month after the president had caused the notice of intention to condemn to be served on the plaintiff and after the filing of the present equitable petition, could relate back and by ratification make such notice good. It is to be noted that the plaintiff never waived due and lawful notice of the condemnation proceeding, but objected in limine to it, to the authority of the president to give it, and to any proceeding being had under it. When notice of condemnation proceedings is re- quired by statute, it must be given in strict conformity to the statute. 2 Lewis on Eminent Domain (2d ed.), §369, p. 859.

Having held that the president was not authorized to give this notice or cause it to be given (which was in itself under our law, the commencement of statutory proceedings to condemn) at the time when he did so, and that the statute had not been pursued when such notice was given, did it become good against the property owner whose land was thus sought to be condemned by reason of the ratification? The general rule is that a ratification by the principal relates back to the act ratified, and takes effect as if such act were originally authorized. Civil Code, §3019. Some of the decisions use very broad language, such as, that an act ratified is in all respects like an act originally authorized. But such language must be construed in the light of the facts of the case being considered. It has been often held that a ratification of an unauthorized act can not cut off an intervening equity or destroy rights of third parties which have arisen between the act and the ratification. Thus it has been declared that "If a party has a complete defense to an action at the time suit is brought, he can not be deprived thereof by a third party ratifying a deed which at the commencement of the suit was without binding force for want of such ratification." *Graham* v. *Williams,* 114 *Ga.* 716. See discussion of the subject of ratification in *Atlanta Buggy Co.* v. *Hess Spring & Axle Co.,* 124 *Ga.* 341, 342. After stating the general rule and giving illustrations of it, Judge Story said (Story on Agency, 9th ed. §246) : "On the other hand, if the act done by such person would, if authorized, create a right to have some act or duty performed by a third person, so as to subject him to damages or losses, for the non-performance of that act or duty, or would defeat a right or an estate already vested in the latter, there the subsequent ratification or adoption of the unauthorized act by the principal will not give validity to it, so as to bind such third person to the consequences." It has accordingly been held that, if a lease contains a condition that it may be determined upon six months notice, such notice given by an unauthorized person for the landlord, although subsequently ratified and adopted by the latter, will not be a valid notice to determine the lease. Buron *v.* Denman, 2 Exch. 166. The basis of this decision was that the notice was one to defeat an estate, and that the tenant was entitled to such notice as he could act upon with certainty at the time when he received it. In Story on Agency (9th ed.), §440, it was said: "In many

cases, too, as we have seen, the subsequent ratification of an un-
authorized act, such, for example, as a demand, or notice, or claim,
of an unauthorized agent, will avail to bind the principal, as well as
to confer rights upon him. But this is true only when the act is
beneficial to the principal, and does not create an immediate duty
on another party to do some other act, or does not subject the latter
to some loss, damage, or injury; for then, if permitted, it would
have a retroactive effect to defeat or control pre-existing rights, or
to found duties, a compliance with which was not obligatory, or
even justifiable, at the time, and, of course, which the law will not.
be so unreasonable as to encourage or establish." As to the state-
ment that the act must be beneficial to the principal, we need express
no opinion. See also Right *v.* Cuthell, 5 East, 244; Doe d. Mann
*v.* Walters, 10 B. & C. 626 (21 E. C. L. R. 265); Doe d. Lyster
*v.* Goldwin, 2 Q. B. 143, 10 L. J. Q. B. 275, 57 Rev. Rep. 621;
State *v.* Jersey City Forge Co., 38 N. J. L. (9 Vroom) 74; 1 Am.
& Eng. Encyc. L. (2d ed.) 1194; Ewell's Evans on Agency, 49;
Dunlap's Paley on Agency (4th ed.), side pp. 190-192, and notes.
The rule has been recognized by this court in *McCroskey* v. *Hamil-
ton,* 108 *Ga.* 640, 643.

In proceedings to condemn private property for public purposes
under the code, the notice to be served must describe the property
or franchise, and the amount of interest therein condemned, fix the
time when the hearing will be had on the premises, give the name
of the assessor selected by the corporation, and request the owner,
trustee or representative to select an assessor. It must be served
at least fifteen days before the day fixed for assessing damages.
Civil Code, §§ 4660, 4669. If the corporation seeking such con-
demnation shall notify the ordinary that the owner or persons in-
terested have failed to select an assessor, the ordinary shall select
an assessor for such persons. Civil Code, § 4670. The two asses-
sors thus selected shall choose a third assessor. Civil Code, § 4671.
It will be perceived that, if the notice when served was unauthor-
ized as the beginning of the proceedings, the time fixed in it for
the meeting of the assessors had passed some weeks before the
attempted ratification. Suppose that the president had notified the
ordinary that the property owner was in default, and obtained the
appointment of an assessor for the owner, could the corporation then
have ratified the act of its president, and have declared that the

matter stood just as if he were originally authorized to proceed; that if he had been so authorized, the property owner would have been in default, and would have lost her right to name an assessor, and that she must accept the assessor appointed by the ordinary? Could she be placed in any such position by virtue of the doctrine or ratification? Surely she can not be placed in default by virtue of ratification of a notice which was illegal when given. If the judgment refusing the injunction should now be affirmed, where would she stand relatively to the appointment of an assessor? The time fixed has elapsed, and she has made no appointment. If by virtue of the ratification she stands in default as if the notice had originally been lawful, can the company apply at once to the ordinary for the appointment of an assessor on her behalf? It may be said that the company would give her an opportunity to make the appointment. But if its contention as to the effect of ratification be correct, would such opportunity be allowed her as matter of grace, or as matter of law? If as matter of law, then it does not stand just as it would have done had the notice been authorized by law. How long, and from what date would she have the right of appointment, if such ratification relates back to the date of the notice?

In State v. Proprietors of Morris Aqueduct, 58 N. J. L. 303 (33 Atl. 252), it was held that, under the facts of the case, the president of the condemning company apparently had implied authority from the directors to institute proceedings to condemn; but if not, that the subsequent approval and adoption by the directors of such proceedings instituted by him would sustain an order made thereon. It appears, however, that in New Jersey the proceeding was by applying to a justice to have commissioners appointed to assess damages, and his judgment appointing them was such an adjudication as to authorize a review by certiorari. In the opinion Magie, J., said: "I think it must be conceded that, before a corporation authorized to condemn lands necessary for its purpose can proceed to acquire such lands by condemnation, it should determine that the necessity exists." He further thought that such determination need not be formally expressed, and that, under the facts before him, there had been substantially a determination. It was said that the lack of direct authority in the president, if there was such lack, had done no injury to the land-

owner, who had had an opportunity to raise, and had raised, the real question in the case. It will be readily seen that this differs from a proceeding authorized to be commenced by the corporation by the service of a notice under which the landowner must appoint an assessor within a limited time, or be in danger of having the ordinary appoint one for him as being in default. The case of *Bowe* v. *Gress Lumber Co.,* 86 *Ga.* 17, also furnishes a very different kind of procedure. There a person having an equitable interest brought an action in the name of another, suing for his use, without first obtaining the assent of such person. It was held that the latter could ratify such use of its name at any time while the action was pending. It was said, in the opinion, that it was not unlikely that the person beneficially interested had a right to use the name of the other person on the sole condition of indemnifying it against costs; but that at any rate there was no obstacle to prosecuting the action after the assent and ratification. Moreover the Civil Code, § 5105, declares that "when it becomes necessary for the purpose of enforcing the rights of such plaintiff, he may amend by substituting the name of another person in his stead, suing for his use."

7. Complaint is made that the direction followed by the defendant's road as laid out was not the direction authorized by its charter, and therefore the effort to condemn her land was illegal; and that no action had been taken by the stockholders changing the direction fixed by the charter, before condemnation. If there was a change of the general direction and route of the railroad from that stated in the original petition, within the meaning of the law, a vote of the stockholders would have been necessary to make it legal. Civil Code, § 2171. But the question is, was there such a change as contemplated by that section? The certificate of incorporation described the railroad which it was intended to construct and operate as "a railroad from Howell's station, in Fulton county, in an easterly direction through said county to a point at or near the center of the city of Atlanta, a distance of about three miles, and entirely in Fulton county, Georgia." The evidence shows that Howell's station is a point outside the corporate limits of the city of Atlanta in a general northwesterly direction from the center of the city; and the distance from that station to the corporate limits appears, from the map introduced in evidence, to be somewhat less

than the distance from the corporate limits to the geographical center of the city. The road as projected is not straight, but extends in a general southeasterly direction, and sometimes nearer southerly than easterly, to a point in the city some blocks distant from the center of the city, but, according to the evidence, within the general central or business portion of the city. The law only requires that the petition for incorporation shall state "the general direction of said road." Civil Code, §2160. We presume that the certificate of incorporation followed the petition in the matter of description. "Easterly" is a somewhat indefinite term. In deeds and like instruments the expression, when unqualified, and where there was nothing else to show or vary the direction, has sometimes been construed to mean due east. But if the two termini of the line are fixed, or there are other words which qualify the meaning of the term easterly, the direction will not be held to be one directly east. In the case at bar it is evident that a line running due east from Howell's station was not intended. Such a line would not enter the city of Atlanta at all, and would probably not touch any part of it. It would certainly not extend to any point which might be called at or near the center of the city relatively to the starting point. The charter provides that one terminus shall be Howell's station, and the other a point at or near the center of the city of Atlanta. This leaves very considerable discretion to the company in fixing the second terminus. *Georgia R. Co.* v. *Maddox,* 116 *Ga.* 64, 68, supra; People v. Collins, 19 Wend. 55. Railroads are rarely built on a direct straight line towards some particular point of the compass from the starting point, without deflection or curves. The charter having fixed one terminus, and the company having fixed the other, and the general direction of the road projected between those points being southeasterly, or east of south, it can not be said that the company has violated its charter in thus locating its road, and that the condemnation proceedings instituted are therefore void.

8. It was contended that the evidence showed no proper effort at negotiation for the purchase of the land in question prior to instituting condemnation proceedings. This is necessary. Civil Code, §§4658, 4659; *City of Elberton* v. *Hobbs,* 121 *Ga.* 750. This objection seems to be to the character and extent of the negotiation. In the assignment of error it is said: "The evidence showed no

such effort at negotiation for the purchase of the land in question was made by the defendant as the law requires prior to instituting condemnation proceedings, and no failure to agree." But the real-estate agent who acted for the company in the matter testified, that he visited the plaintiff, discussed the situation with her, and offered her $4,500 for the property for the defendant, which she declined; and that this was a reasonable price, and was offered in good faith before condemnation proceedings were begun. The evidence of the plaintiff differed somewhat from this, but we can not say that the judge erred in finding for the defendant on the point. There was evidence that the plaintiff knew for whom and the purpose for which the land was wanted, and that it was shortly before the condemnation was sought. "A bona fide offer of an amount which the petitioner considered a fair price, and the refusal to accept it, are sufficient negotiations within the statute." Fort St. Union Depot Co. *v.* Jones, 83 Mich. 415 (47 N. W. R. 349). This offer was also ratified.

9, 10. The plaintiff insists that proceedings were instituted against her lot prior to any right in the defendant company to cross Hunter street, on which her lot abuts; and that she is entitled to compensation therefor. This proceeding was to enjoin the condemnation of the plaintiff's lot, not to prevent the crossing of Hunter street. There is nothing to show that she has any greater right or interest in that street than the general public, except the inference which may be drawn as to the ownership of the fee in the street, from the statement that her property abuts thereon and a general reference to her "fee" in the street. This furnishes no reason for enjoining proceedings to condemn her lot. Under section 4683 of the Civil Code, upon condemnation and the payment of award or final judgment, the company "shall become vested with such interest in the property taken as may be necessary to enable the corporation or person taking to exercise their franchise or conduct their business;" and if the company ceases to use the property for the purpose of conducting its business, a reversion occurs to the person from whom the land was taken, his heirs or assigns. Such a condemnation of the plaintiff's lot, therefore, would not carry the absolute fee without condition; nor would it furnish any reason for enjoining the present proceeding because of the public street. If she has any private interest in the street, this proceed-

ing does not destroy it. We do not now decide anything as to what would be the status of private alleys.

The other assignments of error are sufficiently covered by what has been said, without special mention of them. The judgment is reversed solely on the ground that the notice given by the president ·could not be made good by ratification relating back to the time when it was given, and that proceedings to condemn her lot should be enjoined unless and until a proper notice is served. On none ·of the other grounds set up can we hold that the chancellor erred in refusing the injunction.

*Judgment reversed. All the Justices concur, except Fish, C. J., absent.*