## Staunton

### HONAKER v. NEW RIVER, HOLSTON AND WESTERN RAILROAD COMPANY.

#### September 7, 1914.

1. EMINENT DOMAIN—*Railroads—Land Needed—Action of Directors Necessary.*—Where the petition of a railroad company to condemn land for the extension of its road avers that defendants' lands are wanted for petitioner's purposes, and that since it cannot agree with them for their purchase, it has the right to condemn them, and this is put in issue by defendants' plea, the petition should be dismissed in the absence of any evidence that the board of directors, acting together, had either authorized the extension, or adopted or fixed its location.

2. RAILROADS—*Extension of Line—Location—Action of Directors Necessary.*—The determination of a railroad company to extend its line is a matter which should be considered and passed upon by its directors, acting together as a board, especially where the proposed extension is equal in length to the line in operation. The extension ought in the first instance to be determined upon by the board of directors as such, or if determined upon by one of its agents, his action, to be binding upon the corporation, would have to be ratified by the board of directors regularly convened and sitting as such board. A majority of the board cannot undertake to act in their individual names for the board itself. They can bind the corporation only by acting together as a board.

Error to a judgment of the Circuit Court of Bland county on a petition to condemn land. Judgment for the plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*S. W. Williams, S. W. Williams, Jr.,* and *J. Powell Royall,* for the plaintiffs in error.

*Williams & Farrier, Jackson & Henson* and *White, Penn & Penn,* for the defendant in error.

BUCHANAN, J., delivered the opinion of the court.

This proceeding was instituted in the name of the defendant in error for the purpose of condemning certain lands of the plaintiffs in error for railroad purposes. Numerous errors are assigned, but in the view we take of the case only one of them need be considered.

Prior to the appointment of commissioners to ascertain the compensation to which the defendants were entitled for the land sought to be taken, and the damages to the residue of the tract, the defendants filed several pleas, among them one denying all the allegations of the petition and notice, and called for proof thereof. This denial placed upon the plaintiff company the burden of showing that it was entitled to exercise the right of eminent domain and to condemn the defendants' land for its purpose.

The plaintiff company was chartered by the General Assembly and authorized to construct and operate a railroad from Narrows, a point on the Norfolk and Western Railway in Giles county, and running in a westerly direction through the counties of Giles and Bland, and from thence to the Tennessee or Kentucky State line. Acts of Assembly, 1900, ch. 59, p. 65, etc.

Upon the issues raised by the said pleas, the only evidence introduced by the railway company was that of Mr. Bastian, the manager and secretary of the railroad company. After stating that he had been performing all the duties of manager since 1904, he testified as follows:

"Question by attorney for plaintiff railroad company:

"Q. Please state if you are the Mr. F. E. Bastian

referred to in these proceedings and how long you have been manager of the said New River, Holston and Western Railroad Company.

"A. I am; since 1904, practically since 1900.

"Q. Since that time, when it has become necessary to purchase land or to negotiate for land for right·of way by the railroad, who has made these purchases and negotiation?

"A. I have.

"Q. What effort, if any, did you make on behalf of the company to purchase this land set forth in the record of this case from Mr. Honaker or either or both of them?

"A. After the road was located through the land on two or three occasions I went to see Mr. Honaker and asked him to name us a price for right-of-way and he put me off by telling me he would have to see his partner Mr. Kroll. · I finally went to Tazewell and saw Mr. Kroll myself and he told me he did not want to name a price, that he preferred to consult with Mr. Honaker. I arranged for Mr. Kroll and Mr. Honaker to meet at Rocky Gap. Mr. Kroll went there and came back and reported to me that he was unable to make any arrangement with Mr. Honaker and told me that he had left the matter entirely in Mr. Honaker's hands. Several days after that I saw Mr. Honaker and he told me that he would take $5000.00 for the right-of-way, that of course we could put commissioners on the land and if they did not give him what he thought was right he could take the case to a higher court, because Mr. Kroll was a non-resident of the State. I shook my head, did not argue the matter, because I considered the matter beyond my reach.

"Q. Please state what you mean when you stated that you considered the price beyond your reach?

"A. I considered the price entirely too high for the land.

"Q.   Who went with you to see Mr. Kroll?

"A.   Mr. Farrier.

"Q.   Did you have a map or plat of the land with you?

"A.   Yes.

"Q.   Did Kroll ever name you a price?

"A.   He never named any price for the right of way but named a price of $2500.00 for his interest for the property.

"Q.   You say that you were elected manager of the road.   Was there any other manager?

"A.   There was not.

"Q.   Has any. one except yourself since 1904 been performing any of the duties of manager?

"A.   No, sir.

"Q.   I will be glad if you will state, since these proceedings were instituted or prosecuted, what officers of the said railroad company you have reported to, or communicated with, concerning the same.

"A.   Mr. D. P. Leas, our treasurer, who had been handling the affairs for our president who is sick, and Mr. S. H. McVitty, one of the directors of the road and son of the president, who has been in a general way representing the president along with Mr. Leas.

"Q.   State whether or not you communicated to Mr. D. P. Leas, the treasurer, and in conversation with Mr. S. H. McVitty the progress and status of this case, and other cases and in reference to the proposed extension of said railroad?

"A.   I have been keeping them both informed as to the progress and they seemed pleased with the progress.

"Q.   Please state the amount of stock owned by Leas and McVitty?

"A.   I am not certain, but I think they own between 80 and 90 *per cent.*

"Q.   When did you have the negotiations with Honaker and Kroll to which you have referred?

"A. Some time in January, 1912, and after the line was surveyed and before these proceedings were begun.

"Q. For what purpose does your company desire the land sought to be taken in this case?

"A. For the construction, operation and maintenance of a railroad.

*Cross-examination.*

"Q. How do you know this?

"A. Because we surveyed the line for a matter of twenty miles and located the line for proposed extension.

"Q. Do you know of your own knowledge that the said company, by any action of its stockholders, ever authorized any extension of its lines, or ever authorized this proceeding to be instituted to acquire this right of way through Honaker's lands, if so, how do you know it?

"A. By having reported the proceedings to Mr. D. P. Leas as well as other matters pertaining to the railroad and he not making any objection I assume that my actions were proper.

"Q. Is this all you can say in answer to my last question?

"A. I might add that (I) talked the matter over with Mr. S. H. McVitty, who in a general way represents the president who is sick, and he confirmed my action.

"Q. Is that all?

"A. That is all.

"Q. Do you of your own personal knowledge know that the board of directors of the New River, Holston and Western Railroad Company ever authorized any extension of the lines of said railroad from, Rocky Gap, or that said board of directors ever authorized the proceedings to be instituted to condemn the lands of Honaker and Kroll mentioned in this case, if so, how do you know it?

"A. Do not know of a positive fact for the reason

that occasionally the directors have meetings in Philadelphia and the minutes are in Philadelphia for safekeping.

"Q. You say that you are secretary of said railroad company; don't you as such secretary have the custody of the books of the company, if not, who has?

"A. I have just stated that the books are kept in Philadelphia for safe-keeping.

"Q. Whose business is it to write upon the books of the company the minutes of the stockholders' meetings?

"A. Mine.

"Q. When did you last attend a stockholders' meeting of said company and write up the proceedings of the meeting?

"A. Tuesday, April 2, 1912.

"Q. Where was the meeting held?

"A. Narrows, Giles county, Virginia.

"Q. State when the last meeting of the stockholders of said company was held preceding the said April meeting of 1912.

"A. That I am unable to tell for the reason that I have told you that sometimes meetings were held in Philadelphia that I was unable to attend.

"Q. When was the last meeting of the stockholders held that you did attend prior to April, 1912?

"A. The first Tuesday in April, 1911, that was the date of the annual meetings of the stockholders for each year.

"Q. Where is the principal office of the said railroad company located?

"A. Narrows, Giles county, Virginia.

"Q. You speak of extending said railroad. Please state from what point and to what point is it proposed to extend it?

"A. From Rocky Gap for twenty miles up Wolf creek and Hunting Camp creek in Bland county, Virginia.

"Q. Do you of your own personal knowledge know that the said New River, Holston and Western Railroad Company ever by any resolution of its stockholders authorized such extension to be made, if. so, how do you know it?

"A. I do not for the reasons stated; the minute books are kept at Philadelphia for safe-keeping.

"Q. Was the book in which the minutes of the stockholders meetings are kept present at the said April meeting, 1912, which you attended?

"A. It was.

"Q. Did you write up in said book the said proceedings of said meeting of said stockholders held in April, 1912?

"A. I did.

"Q. Who were the directors of said railroad company at the time the institution of the proceedings in this case?

"A. I think T. E. McVitty, Philadelphia, Pennsylvania; D. P. Leas, Philadelphia; Mr. Leroy P. Leas, Philadelphia; S. H. McVitty, Salem, Virginia, and myself, F. E. Bastian, Narrows, Virginia.

"Q. Do you of your own personal konwledge know that the board of directors of said railroad company by any resolution of said board ever authorized the extension of said railroad from Rocky Gap; if, so, how do you know it?

"A. I do not.

"Q. Do you not know the fact that one W. E. Mingea holds an option on said New River, Holston and Western Railroad Company for the purchase of its property and franchise, and that he is the moving spirit behind the proposed extension of said railroad from Rocky Gap?

"A. I have heard it reported so.

"Q. Heard it from whom?

"A.   Neighbors.

"Q.   Did you ever hear said W. E. Mingea say so?

"A.   I did.

"Q.   Did you ever hear any of the stockholders or directors of said railroad company say so; if so, state whom and when?

"A.   Yes, Mr. S. H. McVitty. I don't recall the date. I can't remember the date although I see him often.

"Q.   If you know, please state who is paying the cost and expenses for making the survey for said extension for said railroad?

"A.   I suppose our treasurer, Mr. D. P. Leas.

"Q.   I do not want suppositions, I want facts. Do you of your own personal knowledge know who is paying the cost and expenses of said surveys for said extension for said railroad?

"A.   I do not know.

"Q.   Do you of your own personal knowledge know who is paying for the right of way for said proposed extension of said railroad from Rocky Gap; if so, how do you know it?

"A.   Been none paid for—I don't know.

"Q.   If options obtained for the right of way are closed and taken up you do not know of your own personal knowledge who will furnish the money to pay for the same do you?

"A.   The treasurer will.

"Q.   How do you know this, please?

"A.   This is the usual manner.

"Q.   Is this all you can say in answer to this last question?

"A.   It is.

"Q.   Do you of your own personal knowledge know that the stockholders of said railroad company ever at any time by any resolution authorized the treasurer of

said company either to pay the money on said option for said right of way or to pay for any right of way?

"A. I do not remember that they did.

"Q. You said that you are the manager of said railroad, please state what your duties are as such manager?

"A. All the duties pertaining to the manager of a railroad.

"Q. What are those duties?

"A. Varied on a small railroad.

. . . . .

"Q. If you had agreed with the defendant, Honaker, upon the price and terms for the purchase of said land referred to in this proceeding, you will please state what authority you had, if any, to close the contract of purchase with said Honaker for said land?

"A. Mr. Mingea advised me to go ahead and take contracts and purchase rights of way, and he being a man of good reputation I went ahead and advised our Philadelphia office of the progress being made and they seemed pleased with my report.

"Q. If Mr. Mingea advised you to go ahead and take contracts and purchase rights of way and he being a man of good reputation you expected, of course, did you not, that Mr. Mingea would put up the money to meet your said contracts, purchases did you not, and if not, why not?

"A. From correspondence with our Philadelphia office I was lead to believe that Mr. Mingea was acting for the railroad. I never give it a thought as to that part, and of course expected the treasurer of the New River, Holston and Western Railroad Company to pay for it.

"Q. Why did you expect this. Who ever told you that the said treasurer of said company would pay for said contracts and purchases?

"A. From past experience in taking contracts for right of way upon other extensions of this railroad.

"Q. That was all was it?

"A. Yes sir.

. . . . . . . . .

"Q. If you and Honaker had agreed on the price and terms for the purchase of the right of way through said land did you have any other authority to close the contract with Honaker or to pay the purchase money therefor than what you have already stated in your testimony in this case?

"A. Nothing more than I assumed I had in the purchase of other rights of way which contracts were closed and paid for by the railroad company.

"Q. Now please state what contracts you refer to in your last answer, and how do you know that they were paid for by the railroad company?

"A. Beginning at Penvir on through to Rocky Gap— R. L. Shrader and others.

"Q. When was this. How long ago?

"A. I can't tell exactly. Several years ago.

"Q. Then you are unable to name any right of way on the proposed extension from Rocky Gap which your company has paid for.

"A. They have not taken up any of them yet.

"Q. Then the said railroad company has never sent you any check to pay for any right of way on the proposed extension?

"A. Not as yet."

This evidence, it is claimed, was sufficient to show that the railroad company desired the defendants' lands for its purposes as a railroad, and that it had been unable to agree with the land owners for its purchase; and that if it were necessary for the stockholders or directors to authorize an extension of the railroad and fix its loca-

tion before condemnation proceedings were commenced, in the absence of any plea or proof to the contrary it would be presumed that the extension had been authorized and the location adopted by the governing body of the corporation.

The court is of opinion that the railroad company is in error in its contention that there were no pleas filed which put in issue the question whether or not the extension of the road had been authorized, or the survey through the defendants' lands adopted by the railroad company. Plea No. 1 denies every allegation of fact averred in the petition. One of its averments is that the defendants' lands are wanted for its purposes and that since it cannot agree with them for their purchase it has the right to condemn them. If the company had never authorized the extension proposed and had not adopted the location made on the defendants' lands, it cannot be said that the land is wanted by the railroad company, or that it has the right to condemn it for the purpose for which it was chartered. There is not only no satisfactory proof that the board of directors had authorized the extension of the road or had adopted or approved of the location made, but on the contrary the evidence of Mr. Bastian, the general manager, the secretary of the company, and one of its directors, tends very strongly to show that the board of directors acting together had neither authorized the extension nor adopted or fixed its location.

It is said in 10 Cyc. 774-6, in the article on Corporations, edited by Judge Thompson, in discussing the mode in which directors may act, and the statement seems to be sustained by the cases: ''We may settle down with confidence upon this principle, that in all matters involving the exercise of what might be termed a legislative or judicial discretion, and which the directors, therefore,

cannot delegate to others, as elsewhere shown, they can bind the corporation only by acting together as a board. A majority of them cannot undertake to act in their individual names for the board itself, and no act can be done affecting the ownership of property except by a resolution of the board when regularly constituted and sitting in consultation." 3 Thomp. on Corp., 3905, 3906, 3944; Morawetz on Corp. (1st ed.), sec. 246; 1 Elliott on Railroads, secs. 255-257, 920.

The determination of a railroad company to extend its line would seem clearly to involve the exercise of legislative or judicial discretion, and is a matter which should be considered and passed upon by its directors, acting together as a board, especially when the proposed extension is equal in length to the line in operation. The extension ought in the first instance to be determined upon by the board of directors as such, or if determined upon by one of its agents, his action to be binding upon the corporation would have to be ratified by the board of directors regularly convened and sitting as such board.

The record not only does not show that the extension determined upon by the general manager was so authorized or ratified by the board of directors as such, but the most the evidence can be said to show is that when the directors or the majority of them individually were informed of the action of the manager, they did not object, and some of them approved of his action in instituting these proceedings.

The cases are not agreed as to whether, where a railroad company has determined upon building or extending its line, the location made by the engineer must be authorized or ratified by the board of directors as such. See *Bridewell* v. *Gate City Terminal Co.* 127 Ga. 520, 56 S. E. 625, 10 L. R. A. (N. S.) 909, and authorities cited; *State* v. *Proprietors of Morris Aqueduct*, 58 N. J.

Law 303, 53 Atl. 252; *C. & O. Ry. Co.* v. *Deepwater Ry. Co.,* 57 W. Va. 641, 50 S. E. 890; *Williamsport Co.* v. *Philadelphia, &c. R. Co.,* 141 Pa. 407, 21 Atl. 645, 12 L. R. A. 220; Lewis on Em. Dom. (2nd ed.), sec. 307. But we have not been cited to any authority which holds that it is not necessary for the board of directors of a railroad company to authorize, as a board, an extension of its line; or if determined upon by one of its agents, to ratify such action as a board, before it has the right to exercise the power of eminent domain in obtaining property for such extension.

The court is of opinion that it was not shown upon the trial of the issue raised by plea No. 1 that the railroad company had the right to condemn the lands of the defendants when these proceedings were instituted, and the trial court should, therefore, have sustained said plea and dismissed the petition. For this error its judgment must be reversed and this court will enter such order as the circuit court ought to have entered.

*Reversed.*