Staunton.

# New River, Holston and Western Railroad Co. v. Honaker and Others.

September 11, 1916.

1. EMINENT DOMAIN—*Commissioners' Report*—*"Treating" Commissioners.*—
For reasons of public policy, commissioners in condemnation proceedings should be kept free from every suspicion of influence by any party to the litigation, and their award will be set aside where it appears that, pending the discharge of their duties, any of them were "treated, fed and entertained" by any one having an interest in the case, his agent or attorney, without regard to its actual influence on the award. The same rule applies to the award of the commissioners as to the verdict of a jury under similar conditions.

2. EMINENT DOMAIN—*Judgment Valid Till Reversed*—*Acts Done Under Judgment.*—A judgment of condemnation of land for a right of way for a railroad is not void where it appears that the proceeding was before the proper court, all proper parties were before the court, and all acts required as preliminary to the application were done or alleged in the petition to have been done, and the right of the petitioner to condemn was put in issue and tried by the court. Entry under such judgment, pending an appeal therefrom, is not without legal right or lawful authority, and the railroad company will be protected in acts done in reliance thereon prior to its reversal.

3. EMINENT DOMAIN—*Damages*—*Improvements by Petitioner*—*Due Process.*—Where a railroad company has entered upon land under a judgment of condemnation such as is mentioned in the preceding paragraph, and placed its roadbed and track upon the land, but the judgment is reversed on appeal, and a second application is made by the same company to condemn the same land, the value of the improvements placed upon the land by the company acting under the former judgment should not be taken into consideration by the commissioners in estimating the damages to be paid to the owner for the land taken. The refusal to give the owner of the land the value of such improvements is not a taking of his property without due process of law within the meaning of the Federal Constitution.

Error to a judgment of the Circuit Court of Bland county in a condemnation proceeding. Judgment for the defendant. Complainant assigns error.

*Reversed.*

The opinion states the case.

*White,* Penn & Penn, *Jackson & Henson* and *Williams & Farrier,* for the plaintiff in error.

*Williams & Williams,* T. J. Muncy and *J. Powell Royall,* for the defendants in error.

SIMS, J., delivered the opinion of the court.

This is an appeal from a judgment of the Circuit Court of Bland county, entered October 20, 1915, in a condemnation proceeding pending in said court wherein the appellant was plaintiff and the appellees were defendants.

This case is the sequel of *Honaker* v. *New River, Holston and Western Railroad Company,* reported in 116 Va. 662, 82 S. E. 727. As appears from such report, the plaintiff attempted to condemn the same land which is involved in the proceedings in the case at bar by condemnation proceedings under the statute law of Virginia, all the requisites required by statute preceding the petition for appointment of commissioners were complied with and the statutory requirements with respect to the petition were set out in the original petition, including (as appears from such original petition) the allegation "that petitioner is desirous of acquiring the fee simple estate in, and title to, the hereinafter described parcel of land," etc., and

seeking the condemnation of precisely the same right of way as is involved in the case at bar; the same parties were before the court in that proceeding as in the case at bar; a plea was filed by defendants denying all the allegations of the petition and proof was taken; judgment of the court below was entered in such original proceedings in favor of the plaintiff condemning the strip of land in question; the plaintiff paid into court the sum of $900, the amount of damages fixed by commissioners and confirmed by the court below.

On writ of error to said judgment, this court reversed the judgment of the court below on the ground that the proof did not support the allegations of the petition, "that petitioner was desirous of acquiring . . . the said parcel of land," in this, that it did not show that the plaintiff railroad company had, as a matter of fact by action of its board of directors, by resolution of such board, authorized any extension of its line, or that the action of the agents of such company had been ratified by the board of directors as a board. The court held that such authorization or ratification was an act of the plaintiff which it must perform before it had the right to exercise the power of eminent domain in obtaining property for such extension, and the court was, therefore, of opinion that it was not shown upon the trial that the railroad company had the right to condemn the lands of the defendants when the said original proceedings were instituted, and this court dismissed the original petition by order entered September 7, 1914.

Pending said former proceedings in this court, no supersedeas being allowed by statute in such cases, the plaintiff proceeded with the construction of its railroad upon said condemned strip of land, and before the order of this court dismissing the case was entered,

placed upon such strip of land its roadbed, track and other improvements.

On September 29, 1914, promptly after the decision of this court was certified to the court below, said plaintiff again filed its petition in the latter court against the same defendants for the purpose of condemning the same land, again setting out all the requisites required by statute, asking that a fee simple interest therein be condemned, as asked in the original petition, but alleging the situation and circumstances under which it placed said improvements on such land, taking the position that by reason thereof it would not be proper for the commissioners who might thereafter be appointed, in ascertaining just compensation to the owners of said land, to take into consideration the value of said improvements.

After sundry proceedings in the court below not drawn in question by the assignments of error on the present appeal, on January 6, 1915, five commissioners, to-wit, Blankenship, Songer, Barnard, Miller and Wohlford, were appointed by the court below to ascertain the compensation to which defendants were entitled for the land sought to be taken, and the damages to the residue of the tract. The commissioners went upon the land, heard evidence and made their report, fixing $300 as compensation for the land sought to be taken, $1,000 for the damages to the residue of the tract, and $4,000 as damages to and for the water power of defendants on the residue of the tract partly taken, making a total of $5,300, and in obedience to instructions of the court below $15,263.15 was reported as the value of the improvements, consisting of railroad roadbed, track, etc., placed by the plaintiff on said land as aforesaid, as of September 29, 1914. All five of the commissioners acted up to the point of

making their report, but only three of them, namely, Wohlford, Blankenship and Miller, signed or concurred in the report. The other two commissioners did not agree to the award and declined to sign the report, because they thought the damages thereby allowed were excessive.

On the subject of the commissioners being treated, fed and entertained by one of the defendants, J. D. Honaker, covered by one of the assignments of error to be considered, the testimony was as follows:

Commissioner Blankenship testified as follows:

Q. Mr. Blankenship, you were one of the commissioners in this case, I believe?

A. Yes, sir.

Q. How far do you live from where this land is situated?

A. I live near Mechanicsburg.

Q. How far is that?

A. I couldn't tell you the exact distance.

Q. I don't mean the exact distance, but about?

A. Some twenty miles, I reckon.

Q. Do you recall what date it was that this commission proceeded to act, I mean when you heard the evidence?

A. The 16th of last March or about that time.

Q. What time did you go over there?

A. We went over there on the 15th.

Q. And you acted on the 16th?

A. Yes, sir; the 16th, 17th and maybe the 18th.

Q. With whom did you spend the night, the night of the 15th.

A. We spent the night of the 15th at Mr. Honaker's.

Q. Mr. J. D. Honaker's.

A. Yes, sir, and I will tell you how come us to be there if you want to know.

Q. All right; go ahead?

A. It was not our intention to put up with either of the Honakers when we left home, we expected to put up at Mr. Tuggle's, as he had been keeping a boarding house and we went in a hack, the five of us, and we got opposite his house, and I went to see Mr. Tuggle to see if he could keep us, and while I was talking to his wife he came right in, he and Jock Honaker, they had been on the mountain and Mr. Tuggle and Mr. Honaker had been on the mountain looking up some lines as well as I remember, and he said he could not well take care of us people, that the railroad company had spoken to him for board for some of the lawyers and some of the witnesses, and he said if you cannot do any better why I will try to do the best I can for you, and Mr. Honaker said, Jock Honaker said, come on down here and I will find you somewhere to stay, and we were glad enough to get somewhere to stay. We had driven from Mechanicsburg and it was cold and we followed him, there was nowhere else for us to go, but we did not intend putting up at Mr. Honaker's at all, but that is how we come to go to Mr. Honaker's.

Q. How long were the proceedings going on?

A. We were there I believe they released us Friday about eleven o'clock as well as I remember.

Q. Where did you dine or take your dinners during that time?

A. We ate dinner the next day at Mr. Honaker's and then young Jim Honaker said you fellows had better go down with us, I expect, because they are all crowded here right smart with company, and that suited us very well, and I think we went down there every night, and perhaps we eat dinner one day at Mr. Tuggle's, but the balance of the time we ate dinner at Mr. J. D. Honaker's because it was about the only

place that was prepared for us and about the only place that could take care of us right close there. If we could have stayed at Mr. Tuggle's we would have stayed there all the time, but as he told us what he did we never tried any more there for board.

Q. And you never tried to stay anywhere else except at Mr. Honaker's after you spoke to Mr. Tuggle?

A. No, sir; because there wasn't many places there handy that the commission could stay.

By Judge Jackson: I want to state right here because I think it is perfectly proper, that we talked about the commissioners staying at Mr. Jim Honaker's and we agreed that it would be all right for them to stay down there.

Witness: I believe that report came to us as well as I remember, that it was satisfactory for us to go to Mr. Jim Honaker's, I think that report did come to us.

By Judge Hanson:

Q. Mr. Jim Honaker is not one of the defendants here?

A. No, sir.

Q. Who was at Mr. J. D. Honaker's that night that you all spent there the first night?

A. There was two engineers there, one from Radford, and I think one was Professor Begg, and I believe another one was named Baird. I never did meet him before or since but I heard his name as he was introduced to us.

Q. Was Mr. Hill there, one of the witnesses from Bluefield?

A. I wouldn't be positive that he was or not.

Q. Was Mr. Page there?

A. I wouldn't say that he was.

Q. Will you say he was not?

A. I wouldn't say that he was or wasn't.

Q. There was several other gentlemen besides those two?

A. I do not have any recollection of anybody except the two engineers, I do not have any recollection of any others now.

Q. But Professor Begg and Mr. Baird were there?

A. Yes, sir; they were there, I am sure.

Commissioner Wohlford testified as follows:

By Judge Henson:

Q. Mr. Wohlford, I just don't know, but I am asking for information. Did Mr. Honaker or any member of his family let you have any whiskey while you were there on that trip?

A. He did when we went to leave, as we left.

Q. He let you have it?

A. Yes, sir.

Q. Who let you have it?

A. Mr. J. D. Honaker.

Q. How much?

A. A quart of whiskey.

Q. How long after that before you made your report?

A. I guess it was a week.

By Judge Williams:

Q. Do you recollect how he came to give it to you? Didn't you ask him for it?

A. Yes, sir; it was very cold and I asked Mr. Honaker for it.

Q. And he gave it to you?

A. Yes, sir.

Commissioner Miller testified as follows:

Q. Did anybody down there have any whiskey before you got through or anything of that sort, or after you got through?

A. Which?

Q. Did any of the commissioners have any?

A. No, sir.

Q. None that you saw?

A. I don't exactly understand your question.

Q. Did any of the commissioners while they were down there before they came back home had any whiskey, any of them?

A. While they were down there?

Q. Or before or when they came back?

A. It might have been possible.

Q. It is not any crime but I just want to know the facts.

A. I understand you.

Q. Do you know where they got it?

A. No, sir; I do not.

Q. That is all.

By Judge Williams: We desire to make the same motion and without waiving our exceptions we proceed to cross-examine the witness.

Cross-Examination.

By Judge Williams:

Q. You did not see anybody drink any whiskey there yourself, did you?

A. No, sir.

Q. Nobody was drunk there that you saw?

A. No, sir.

Q. How old are you?

A. 44.

Q. You own and operate a farm?

A. Yes, sir.

Q. And you have handled cattle and were raised on a farm and raised in Bland county?

A. Yes, sir.

Q. And you have known Rocky Gap and the county of Bland all your life?

A. Yes sir.

Q. You went there and exercised your best and honest judgment as an ordinary business man and fixed upon that property what you thought was the fair present value of it, didn't you?

A. .Yes, sir.

By Judge Henson:

Q. .Who had the whiskey?

A. I don't deal in whiskey.

Q. You don't know where it came from?

A. No, sir; I don't know where it came from.

Q. Who had it?

A. Who had the whiskey?

Q. Who did you see use it or have it?

A. Mr. Wohlford had some whiskey with him.

Q. Anybody else?

A. None that I saw.

By Mr. Royall:

Q. The fact that Mr. Wohlford had some whiskey there, did it influence you in any way in arriving at your conclusions in this matter, as to making a very careful view of the premises and hearing the testimony of the witnesses?

A. No, sir; it did not influence me.

Q. You were not influenced by that whatever?

A. No, sir.

Neither Jock Honaker, the son of J. D. Honaker, nor the latter, gave any testimony on this subject.

The points covered by the assignments of error, by counsel for plaintiff and defendants, were properly saved in the court below.

In the view we take of this case, only one assignment of error of the appellant need be considered;

and, as the questions raised by the assignments of cross-error by appellant will necessarily arise and have to be passed upon by the court below in subsequent proceedings, we shall consider also the questions arising on such assignment of cross-error.

The assignment of error by appellant which we shall consider is as follows:

. (1) "That the court erred in not rejecting the report of commissioners and appointing new commissioners to ascertain the damages, because the commissioners were treated, fed and entertained by one of the successful parties during the process of their investigation."

The assignment of cross-error by appellees under Rule VIII (111 Va. VI) of this court, which we shall consider is as follows: ·

(1) "The court erred in refusing to give to the said Honaker and Kroll, the land owners, judgment against the railroad company for the full amount found by the commissioners to be the value of the property on the day the condemnation proceedings were instituted. In other words, the testimony shows that on the day the condemnation proceedings were instituted there was on said land a railroad structure, consisting of roadbed, rails, cross-ties and other fixtures, which go to make a complete railroad track; that all of these fixtures were permanent in their character and constituted a part of the freehold; and the value of these fixtures was ascertained and fixed by the commissioners acting under the court's instructions, to be the sum of $15,265.51, and which added to the amount . allowed the land owners by the commissioners' report makes up the aggregate sum of $20,556.51, for which the circuit court should have rendered judgment in favor of the land owners. The land owners moved

the court to enter judgment for this amount. The court refused to do so, and the said Honaker and Kroll excepted, and now under Rule VIII of the court, assign this action of the court as error apparent from the facts of said judgment and record."

2. "The judgment of the court below in refusing to award to the land owners, Honaker and Kroll, and in refusing to require the said railroad company to pay said Honaker and Kroll the said sum of $15,263.51 with proper interest, as fixed in the commissioners' report as the value of the said improvements and fixtures on said land, was clearly erroneous and has the direct effect of depriving the said Honaker and Kroll of their property in said lands and fixtures to the extent of the said value thereon, without due process of law, and is a direct violation of article 14, section 1, of the Constitution of the United States."

Upon these assignments of error the following questions arise in this case for the consideration of this court:

1. Did the court below err in not setting aside the commissioners' report because the commissioners were "treated, fed and entertained by one of the successful parties during the progress of their investigation?"

2. Did the court below err in refusing to make the railroad company pay the added value of the land due to the improvements placed thereon by the railroad company after the judgment of confirmation of the court below of the damages assessed by the commissioners in the original proceeding and before that judgment was reversed by this court on appeal?

3. Did the action of the court below in refusing to make the railroad company pay the said added value of the land deprive the defendants to that extent of their property without due process of law in viola-

tion of article 14, section 1, of the Constitution of the United States?

We will consider these questions in the order stated.

1. Did the court below err in not setting aside the commissioners' report because the commissioners were "treated, fed and entertained by one of the successful parties, during the progress of their investigation?"

At the outset it should be said that it is argued by their respective counsel that neither plaintiff nor defendants were satisfied with the damages allowed by the report of the commissioners under consideration. The appellant was dissatisfied because the damages allowed greatly exceeded those allowed by the commissioners in the original proceeding, and allowed damages to and for water power said to be partly taken, for which no damages were allowed by the former commissioners' report. The appellees were dissatisfied because a much greater amount than $4,000 was not allowed in respect to the water power. However, the appellees do not complain in this court by assigning any cross-error with respect to such allowance. But in the view we take of this question it is not necessary to determine which side in the case at bar was the "successful party." If the rule being considered is applicable because of other considerations, the interest of the defendant, J. D. Honaker, in the case was sufficient to make it necessary to apply it.

It seems to be conceded in argument that the same rule with respect to setting aside the verdict of a jury because of their being "treated, fed and entertained" by parties to the suit apply equally to the setting aside of the report of commissioners appointed by a court to assess damages in a condemnation proceeding, and we think such should be the rule. The reasons of public policy apply with the same force to both. The

authorities on this subject are very large in number and are collated in *Scott* v. *Tubbs*, 43 Colo. 221, 95 Pac. 540, 19 L. R. A. (N. S.) 733, and note; *Garvin* v. *Howell*, 27 Okl. 373, 113 Pac. 186, 33 L. R. A. (N. S) 862; Ann. Cas. 1912 B, 744; *Sandstrom* v. *Oregon, &c., R. & Nav. Co.*, 69 Or. 194, 136 Pac. 878, 49 L. R. A. (N. S.) 889; 2 .Thompson on Trials, sec. 2526, 2560, and note 43, 2565; 26 Cyc. 802, and note 23.

The cases in Virginia have been few on this subject, we are gratified to say. Lest they may be increased in number we are not disposed to lower the standard of judicial requirement on the subject.

The almost uniform holding of the decisions of all the States and in England is that a verdict rendered by a jury, any of whose members has been *treated by one having an interest in the case*, his agent or attorney, must be set aside, and in nearly all cases the rule is applied without regard to its actual influence on the verdict. The reason for the rule being one of public policy, requiring jurors to be kept out of such a position that their verdict may be the subject of suspicion of being influenced by any party to the litigation, whether such influence was in fact sought to be exerted or not, or in fact existed.

The cases of *Thompson* v. *Commonwealth*, 8 Gratt. (49 Va.) 637, and *State* v. *Greer*, 22 W. Va. 827, cited by counsel for defendants were not cases where any party to the case was connected with the alleged improper conduct of the jury, and hence they are not in point.

We feel that the maintenance of public confidence in the integrity of reports of commissioners, acting under the statute and by appointment of court in the assessment of damages in condemnation proceedings, who are in truth in effect performing the duties of a jury in

an *ad quod damnum* proceeding, is of such transcendent importance that the same rule applicable to juries should be applied; and that such reports should be kept free from the suspicion that the commissioners may have been influenced by any party to the proceeding, whether plaintiff or defendant, by furnishing the commissioners, or any of them who make such reports, with lodging or food or liquor, whether such influence was sought to be exercised or not, or in fact existed.

The next inquiry is—

2. Did the court below err in refusing to make the railroad company pay the added value of the land due to improvements placed thereon by the railroad company after the judgment of confirmation of the court below of the damages assessed by the commissioners in the original proceeding and before the judgment was reviewed by this court on appeal?

Counsel for defendants in their brief, in citing Minor on Real Property, sec. 24 *et seq.*, Devlin on Deeds, sec. 1211 *et seq.*, and Kerr on Real Property, sec. 135, rely upon the strict rules of the common law with respect to fixtures, that a structure placed upon land by a trespasser becomes a part of the realty and cannot be removed.

2 Lewis on Eminent Domain (2nd ed.), sec. 507, in discussing this common law rule as to fixtures says: "The proceeding to ascertain a just compensation to be paid for property taken for public use is not a common law proceeding. The principles to be applied are broad and liberal, and such as are just to both parties. It is a just compensation, no more, no less, which the Constitution requires to be paid. In determining what is just, the courts are not hampered by any hard and fast rules of the common law. As we have already

shown, just compensation to the owner is an indemnity for the loss he sustains, irrespective of the general advantages and disadvantages which affect the community at large. Indemnity, in the case supposed, does not include the value of works prematurely placed upon property. The owner has not lost the value of such works, but if their value is given to him, it is so much in excess of his loss, which is something never contemplated by the Constitution."

Buchanan, J., in *Norfolk & O. V. Ry. Co.* v. *Turnpike Co.*, 111 Va. at p. 141, 68 S. E. 346, Ann. Cas. 1912 A, 239, after quoting and commenting upon this quotation from Lewis on Eminent Domain, it is true, says: "In quoting what Lewis said we do not wish to be understood as approving his statement, so far as it applies to entries upon land without authority express or implied. As was said by the Court of Appeals of New York in the case last cited above" [*Village of St. Johnsville* v. *Smith*, 184 N. Y. 341, 77 N. E. 617, 5 L. R. A. (N. S.) 922], Ann. Cases 379, 382-4, "where the entry was without authority, so far as actual intent is concerned, a personal trespasser who annexes a structure to another's freehold does not mean that it shall become the property of the land owner any more than does a trespassing railway company, or municipality, which does the same thing in contemplation of acquiring the land at some future time by the exercise of the right of eminent domain. The law affixes the consequences to the act, and not to the intent. It says to those who invoke the power of eminent domain, as well as to all others, "if you invade land without legal right and place structures thereon, those structures belong to the land owner." There is no more hardship in applying the rule to the one class of cases than to the other. In both cases the application tends

to prevent a wrong. Its operation in this State has been and doubtless will continue to be most salutary in constraining those municipal and other corporations which the State has authorized to exercise the right of eminent domain, not to assume the possession of land in advance of any right so to do, and thus practically nullify, during the period of the wrongful possession, the provision of the Constitution which guarantees the citizen against being deprived of his property for public use without just compensation.''

In *Norfolk & O. V. Ry. Co.* v. *Turnpike Co., supra,* the railroad company entered under a deed, making its entry lawful, and this court, in the last-named case, speaking through Buchanan, J., at page 142 of 111 Va., on page 350 of 68 S. E. (Ann. Cas. 1912 A, 239), said: "We are of opinion that where a corporation, clothed with the power of eminent domain, lawfully enters into possession of land for its purposes and places improvements thereon, and afterwards institutes condemnation proceedings to cure a defective title, or to extinguish the lien of a deed of trust, it is not proper in ascertaining 'just compensation' for such land to take into consideration the value of such improvement."

In the case at bar the railway company entered under the judgment of the lower court and constructed the improvements in question, pending a writ of error, without a supersedeas being in force. The question we have to determine, therefore, is whether such entry was "lawful."

This is not a case of a mere naked trespasser, entering "without any authority express or implied," assuming "the possession of the land in advance of any right so to do . . in contemplation of acquiring the land at some future time by the exercise of the right of eminent domain." The entry was made only after

42

proceedings were instituted and prosecuted in court, in conformity with the statute in so far as all jurisdictional allegations required by the statute are concerned, to a judgment of the court below in favor of the entry, after which the entry was with "legal right" if this judgment of the court could give it.

In truth the inquiry under consideration is reduced to this: Did the judgment in question give this "legal right" pending the writ of error therefrom?

It is practically conceded in argument that if this judgment was not void but merely voidable, it did give this "legal right."

That the judgment in the case at bar was not void but voidable merely, is apparent from the mere reading of the statute on the subject, contained in sections 4 to 13, inclusive, of the act concerning the exercise of the power of eminent domain, Acts 1902-3-4, p. 497 (Pollard's Code, 1904, sec. 1105-f, sub-sec. 4 to 13).

In the case at bar all the requirements of said sections 4 to 9, inclusive, were complied with, the damages thus ascertained were paid by the railway company in accordance with said section 9, and thereupon, by the express provisions of the statute, "the title to the part of the land . . for which such compensation is" (was) "allowed shall" (was) "be absolutely vested in the company in fee simple . . " "Then follows in section 10 provisions for the appointment of other commissioners under certain circumstances and for proceedings anew; and then section 11 provides, "whether any such new appointment be made or not, the company, on paying into court the sum ascertained by the previous report, may, notwithstanding the pending proceedings, enter into and construct its work upon or through the part of the land described in such previous report. And no order shall

be made nor any injunction awarded by any court or judge to stay the proceedings of the company in due prosecution of its work, unless it be manifest that it, its officers, agents or servants, are transcending their authority and that the interposition of the court is necessary to prevent injury that cannot be adequately compensated in damages."

Such being the validity, force and effect given by the statute to the judgment of the court below and the payment of damages accordingly, we cannot consider it a void judgment, or that a railway company entering thereunder was without "legal right" or "lawful authority" to enter. It seems to us that the "legal right" and "lawful authority" to enter was as great as if the entry had been made under deed. The conclusion that the judgment in question was not void but voidable only is strengthened by an examination of the authorities.

The court below had jurisdiction of the subject matter by section 2 of the act last above cited. All proper parties were before the court below. The acts of the railway company required by the statute prior to its application to the court below for its action were done, or *alleged* in the petition to have been done. The plea of the defendants denying the allegations of the petition put the truth of its allegations of fact in issue. The particular fact thus put in issue was whether the railway company "was desirous of acquiring the fee simple estate in and title to the" strip or parcel of land sought to be condemned. The court below was thus vested with the power to hear the evidence upon and decide this issue. It had jurisdiction to thus hear and determine.

"The power to hear and determine a cause is jurisdiction." *Lemon* v. *Herbert*, 92 Va. 653, 24 S. E. 249.

"A judgment regularly given, although it may be erroneous, is nevertheless the act of the court, and any one who proceeds to enforce it may avail himself of its protection until its reversal. Whatever contrarieties there may be in the adjudged cases in other respects, all the authorities agree where a judgment is merely erroneous, it will afford complete protection to all persons who proceed to enforce it, and who act in reliance on the adjudication." *Thompson* v. *Reasoner*, 122 Ind. 454, 24 N. E. 223, 7 L. R. A. 495.

"The railroad track was constructed by the railroad company while in possession of the land of the defendant, in pursuance of pending proceedings for its condemnation, and its possession was therefore lawful, though the proceedings were dismissed upon appeal after the construction of the track." *California, &c. R. Co.* v. *Armstrong*, 46 Cal. 85.

"These cases proceeded upon the principle that what was lawful when done does not become unlawful by reason of subsequent acts. The chancellor, in entering the judgment in the case referred to, did not act as the agent of either of the parties. The judgment was the act of the law; neither party could control the court and neither was repsonsible for the action. The law constituted a tribunal to determine the rights of the parties. That determination proceeded from a power, above them, and was in no sense their act. A litigant in this court does not procure the judgment entered in any such sense as to render him responsible for the consequence of the judgment, or its reversal by the United States Supreme Court. We have been referred to no case, and can find none, where an action for damages has been sustained upon the reversal of a judgment for acts done pursuant to it, as for a tort." *Bridges* v. *McAllister*,

106 Ky. 791, 51 S. W. 603, 45 L. R. A. 800, 90 Am.
St. Rep. 267.

In *Fisher* v. *Bassett*, 9 Leigh (36 Va.) 119, 33 Am.
Dec. 227, the court, through Tucker, P., delivering
the opinion of the court, says: "The county court is
a court of record and its judgments or sentences cannot
be questioned collaterally in other actions provided it
has jurisdiction of the cause, and this is to be under-
stood as having reference to jurisdiction over the sub-
ject-matter; for though it may be that the facts do
not give jurisdiction over the particular case, yet, if
the jurisdiction extends over that class of cases, the
judgment cannot be questioned for then the question
of jurisdiction enters into and becomes an essential
part of the judgment of the court."

The Virginia case of *Lemon* v. *Herbert*, *supra*, has
a very decided bearing on the question under discus-
sion. In that case it was claimed that the bill set
forth no ground of equitable jurisdiction, but was
merely a declaration of ejectment in disguise, and the
decree void. In answer to this contention the court
said: "Conceding, however, for the sake of argument,
that the complainant had a complete remedy at law,
and that the bill alleged no sufficient ground for the
jurisdiction of a court of equity, still the decree would
not be void and liable to collateral attack. It was a
regular bill in chancery, and the case was proceeded in,
without objection, in accordance with the pleadings and
practice of a court of equity to a final decree. The
bill was filed in, and the decree made by, a court of
general jurisdiction over the subject matter of equita-
ble rights, interests and remedies. 'The power to hear
and determine a cause is jurisdiction.' The court
here had the power to decide whether the case made by
the bill was within the jurisdiction of a court of equity;

and, having proceeded in the case to a final decree, must of necessity have determined that question in favor of its jurisdiction. It may have erred in its decision, but such error would not avoid its decree. The decree would merely be erroneous, but conclusive until reversed or vacated. This court could not determine whether the case was one of equitable jurisdiction or not without an inquiry into the facts, and where inquiry is neceassry the decree, however erroneous, is not void. *Fisher* v. *Bassett*, 9 Leigh 119, 131 (33 Am. Dec. 227); *Cox* v. *Thomas*, 9 Gratt. 323, 328; *Gibson* v. *Beckham*, 16 Gratt. 321, 326; and *Cardoza, Sheriff,* v. *Epps, Sergeant, &c.*, decided at the last term, (23 S. E. 296)."

The court in the course of its opinion cites *Goodman* v. *Minter*, 64 Ala. 410, 38 Am. Rep. 13, in which the Alabama court said: "Where a court of superior or of general jurisdiction is presented with a case of such character that, before rendering a final decree or judgment, it must determine whether it has jurisdiction to pass such judgment, or decree, as is invoked, and it is passed, collaterally the jurisdiction cannot be assailed nor the validity of the judgment or decree be drawn in question. The court has power to hear and determine, and the case is *coram judice.*" And further on he says: "It (the decree) may be erroneous and it may be that, on demurrer or motion to dismiss for want of equity, the chancellor should have dismissed the bill. These were questions he had jurisdiction to decide, and if he erred the law points the mode of correcting the error. Until the decree is reversed, it is binding and conclusive, if the case, as presented by the bill, was of such a character that the court was bound to hear and determine whether it had jurisdiction to grant relief."

"The Supreme Court of the District had jurisdiction over the subject-matter, the *res.* It had jurisdiction over the parties. It was, according to the course of equity proceeding, called upon to examine the will and the statute gave the power to make the sale in certain circumstances. If, then, jurisdiction consists in the power to hear and determine, as has so many times been said, and the court errs in holding that a case has been made either under its inherent power or its statutory authority, can it be said that it has usurped jurisdiction and that its decrees are absolute nullities? To this we cannot consent. If the court was one of general, and not special, jurisdiction—if, under its inherent power, *supplemented by statutory enlargement*, it had jurisdiction under any circumstances to sell the real estate of minors for reinvestment —it had jurisdiction to examine and determine whether the particular application was within or beyond its authority. To do this was jurisdiction. If it errs, it. judgment is reversible by proper appellate procedures But its judgment, until it be corrected, is a judgment, and cannot be regarded as a nullity." *United States* v. *Morse*, 218 U. S. 493, 31 Sup. Ct. 37, 54 L. Ed. 1123, 21 Ann. Cas. 782.

In the case of *Ches. & Western R. R. Co.* v. *Wahsington, &c. Ry. Co.*, 99 Va. 715, 40 S. E. 20, it was held that: "As one railroad company may, under some circumstances, condemn the land of another for its purposes, the right to so condemn is determined by the adjudication in the condemnation proceeding, and such determination cannot be collaterally attacked. The judgment in the condemnation proceeding concludes all questions that could have been therein raised or determined." On page 722 of 99 Va., on page 22 of

40 S. E., the court said: "It is not denied that under some circumstances, unless expressly prohibited, one railroad company may condemn the land of another for its purpose, but it is denied that such circumstances existed in this case. It may be that this is true, but that was one of the questions involved in the condemnation proceedings."

The court further said in the above case on page 724: "That while the proceedings in the county court may have been erroneous, it was not void. Not being void, the propriety or validity of its judgment can no more be impeached in a collateral proceeding than can the judgment of any other court of general jurisdiction having jurisdiction over the subject matter and the parties. The condemnation proceedings are therefore conclusive upon the parties, however erroneous they may be, until set aside or reversed in the manner provided by law."

"The prevailing doctrine is that the reversal of the judgment which is merely erroneous as distinguishable from one that is irregular, or void, merely creates a right *ex aequo et bono* to have restored what has been lost, and that it does not relate back so as to render wrongful acts done under the judgment which were justified at the time." *Bridges* v. *McAllister, supra.*

See also *Porter* v. *Small*, 62 Or. 574, 120 Pac. 393, 124 Pac. 649, 10 L. R. A. (N. S.) 1197, Ann. Cas. 1914-C, 536.

Counsel for defendants cite and rely upon the following authorities in support of their position that the judgment in question was void, and that the railway company, in the case at bar, was a trespasser and hence without "lawful authority" or "legal right" to enter: *Graham* v. *Connorsville R. Co.*, 36 Ind. 463, 30 Am.

Rep. 65; *Merriman* v. *Brown*, 128 Mass. 391, 38 Cyc. 1036; *Ibid.* 1042, No. 70; *Pinney* v. *Borough of Winsted*, 83 Conn. 411, 76 Atl. 994, 20 Ann. Cas. 923; *Va. & S. W. Ry. Co.* v. *Nickels*, 116 Va. 796, 82 S. E. 693; *Cleveland* v. *Clark*, 123 Mich. 179, 81 N. W. 1086, 81 Am. St. Rep. 175-186 *et seq*; *Norfolk, &c. Co.* v. *Turnpike Co.*, *supra*; *Wingfield* v. *Neall*, 60 W. Va. 106, 54 S. E. 47, 10 L. R. A. (N. S.) 443, 116 Am. St. Rep. 882, 9 Am. & Eng. Ann. Cas. p. 987; *In re Egan*, 24 S. D. 301, 123 N. W. 476-488, notes to 96 Am. St. Rep. 128-132. None of these authorities cover the case of a railway company entering under a judgment of a court.

The case of *Graham* v. *Connersville R. Co.*, *supra*, was an Indiana case. So far as appears from the report of it, the railway company entered and placed the improvements on the land in question before it undertook any condemnation proceedings under the statute or it otherwise acquired any right of entry, and the railway company was held to be a trespasser without color of right.

In *Merriman* v. *Brown*, *supra*, the railway company became bankrupt after it put the improvements on the land. It does not appear to have ever undertaken any condemnation proceedings under the statute or otherwise to have acquired any right of entry. A purchaser of the railway tracks, etc., at the bankrupt sale brought suit for the possession of such property, and it was held that the railway company being a mere trespasser without right of entry, neither it nor one claiming under it had the right to enter on the land and remove such property. 36 Cyc. 1036 and 83 Conn. 411, 76 Atl. 994, refer to and report cases of mere naked trespassers without color of rights. 38 Cyc. 1042, No. 70, is not in point.

In *Va. & S. W. Ry. Co.* v. *Nickels, supra,* Buchanan, J., said, in delivering the opinion of the court: "It does appear that the railway company took possession of the land before it instituted this proceeding. Whether it entered 'by force' or as a mere trespasser with or without an intention to condemn, or entered with the consent of the defendants, does not appear. The general rule is that where one invades another's land without legal right and places structures thereon, the structures belong to the land owner. If a railway company claims that its entry was made under circumstances which exempt it from the operation of this rule, it would seem clear that the burden would be upon it to show it. *Prima facie,* a trespassing railroad company occupies no higher position than any other class of trespassers."

In regard to the question under consideration, therefore, this court has taken no position further than that the rule invoked by defendants will be applied in the case of a naked trespasser who invades another's land without legal right and places structures thereon—which, as we have said, is not the case at bar.

*Cleveland* v. *Clark, supra,* was a case of a naked trespasser without color of right.

Nine Anno. Cases, *supra,* contains a discussion of the rights of a *pendente lite* purchaser, but there is nothing therein in contravention of the position that the entry of the railway company in the case at bar was authorized by the judgment in question if that judgment was not void but voidable merely. The same is true of *In re Egan, supra,* when read in connection with what is said in note at p. 132 of 96 Am. St. Rep.: "An erroneous judgment is the act of the court until vacated upon appeal. . . All persons may treat it as valid,

unless we may except from this rule the parties to the suit . . and even they are affected by its reversal no further than by being liable to make restitution of the property in their hands acquired under such judgment. But the distinction between a void and an erroneous judgment should be kept in view, for if a judgment is void no rights can be based upon it . . "

Counsel for defendants cite the case of *C. & O. Ry. Co.* v. *Deepwater R. Co.*, 57 W. Va. 641, 50 S. E. 890, as a case directly in point on their position that the railway company in the case at bar acted at its peril. That case, however, did not involve the rights of a railway company as against the land owner where the company entered and made improvements under condemnation proceedings subsequently held to be defective, but was a case between two railway companies as to priority of rights; and the court intimated that in the former case the railway company might rely upon the *bona fides* of its entry under prior condemnation proceedings where it took subsequent proceedings to cure defects in the first proceedings; so that we do not consider that this case sustains the position of counsel for defendants, but that its reasoning is to the contrary.

The case of *Williamson* v. *Jones*, 43 W. Va. 592, 27 S. E. 411, 38 L. R. A. 694, 64 Am. St. Rep. 891, cited by counsel for defendants to sustain their position that a mistake of law will not avail a party who puts improvements on another's land, does so hold, in construing the statute of West Virginia contained in chapter 9 of the Code of West Virginia on the subject of allowances for improvements, although it qualifies the rule to some extent in that particular case; but we do not consider that the well known rule that no one

is excused for a mistake of law has any modifying bearing on the rule applicable to the case at bar, namely, that a judgment of a court having jurisdiction of the subject matter and of the parties on an issue of fact therein made by the pleadings is a voidable and not a void judgment—from which flow the consequences above discussed.

We come now to the consideration of the third and last question for our consideration, namely:

3.   Did the action of the court below in refusing to make the railroad company pay the said added value of the land deprive the defendants to that extent of their property without due process of law, in violation of article 14, section 1, of the Constitution of the United States?

This question resolves itself into the question of whether the court below had jurisdiction so that its judgment was not void but voidable merely, which we have considered and decided as above noted; hence, any further discussion of it is deemed unnecessary. We are, therefore, of opinion that the action of the court below under consideration did not deprive the defendants of their property without due process of law in violation of article 14, section 1, of the Constitution of the United States.

The court is, therefore, of opinion that the court below did not err in refusing to give to the defendants judgment against the railroad company for the value of the roadbed, rails, cross-ties and other fixtures which were placed by it on the land sought to be condemned in this case; that such judgment of the court in such refusal did not deprive the defendants of such property without due process of law in violation of article 14, section 1, of the Constitution of the United

States; but that such court did err in not rejecting the report of the commissioners and appointing new commissioners to ascertain the damages, because the commissioners were "treated, fed and entertained" and one of them was given a bottle of liquor by one of the parties having an interest in this case. For this error the said judgment must be reversed, and this case will be remanded to the said court for further proceedings therein not in conflict with this opinion.

*Reversed.*